## THE LOS ANGELES SWITCHING CASE.[1]

### APPEAL FROM THE COMMERCE COURT.

No. 98. Argued January 14, 15, 1914.—Decided June 8, 1914.

An order of the Interstate Commerce Commission requiring railway companies to desist from exacting charges for delivering and receiving carload freight to and from industries located upon spurs and sidetracks within the switching limits of a terminal city when such carload freight is moving in interstate commerce incidentally to a system line haul is not open to the objection that it rests upon a construction of the Act to Regulate Commerce which would forbid a carrier from separating its terminal and haulage charges on the same shipment.

*Quære*, and not involved in this decision, whether the rate which the Act to Regulate Commerce requires to be published is a complete rate including not only the charge for hauling but also the charge for the use of terminals at both ends of the line.

---

[1] Docket title of this case is Interstate Commerce Commission, The United States of America, Associated Jobbers of Los Angeles, and Pacific Coast Jobbers and Manufacturers Association, appellants, *v.* Atchison, Topeka and Santa Fe Railway Company, Southern Pacific Company, and San Pedro, Los Angeles and Salt Lake Railroad Company.

The delivery and receipt of goods on an industrial spur-track within the switching limits in a city is not necessarily an added service for which the carrier is entitled to make, or should make, a charge additional to the line-haul rate to and from that city when that rate embraces a receiving and delivery service for which the spur-track service is a substitute.

Industrial spur-tracks established within the carrier's switching limits, within which the team tracks are also located, may constitute an essential part of the carrier's terminal system; and whether or not delivery on the spur-track is an additional service on which to base a charge or merely a substituted service, which is substantially a like service to that included in the line-haul rate and not received, is a question of fact for the Interstate Commerce Commission to determine.

Findings of the Interstate Commerce Commission as to the character and use of industrial spur-tracks within the switching limits of a city are conclusions of fact and not subject to review.

Although the Interstate Commerce Commission may not have found that a switching charge if legal was unreasonable in amount or that the shippers had objected thereto, as the service must be performed according to the law of the land, the shippers are not estopped from bringing the matter before the Commission to the end that the carrier's charges should not be unjustly discriminatory.

It is permissible for a railway company to establish a terminal district; and it is for the Commission to determine according to the actual conditions of operation, whether an extra charge for spur-track delivery within that district, regardless of the variations in distance, is either unreasonable or discriminatory.

This court cannot substitute its judgment for that of the Interstate Commerce Commission upon matters of fact within the province of the Commission.

The order of the Interstate Commerce Commission that the carriers desist from making a switching charge for carload freight moving in interstate commerce to industrial spur-tracks within the switching limits of Los Angeles, California, *sustained.*

Pursuant to the act of October 22, 1913, c. 32, judgments of the Commerce Court reversed by this court are remanded to the District Court of the United States for the district where the case would have been brought had the Commerce Court not been established.

188 Fed. Rep. 229, reversed.

THE facts, which involve the validity of an order of the Interstate Commerce Commission in regard to switching

charges within the yard limits of Los Angeles, California,
are stated in the opinion.

*Mr. Blackburn Esterline,* Special Assistant to the Attorney General, with whom *The Solicitor General* was on the
brief, for the United States, Intervenor:

The action of the Commerce Court in refusing to sustain the motions of the United States to dismiss the bills,
and in holding, on the face of the bills alone, that the court
had the power to decide, notwithstanding the findings of
the Commission based on the evidence, that the service of
making deliveries on the spur tracks was different from
the service of making deliveries on the team tracks, with
a consequent difference in the cost, was so flagrantly erroneous as to require a reversal of the judgments and the
dismissal of the bills.

The question as to what are and what are not terminal
facilities is manifestly a question of fact to be determined
according to the circumstances of each particular case.
The findings made by the Commission, after a careful review of all of the attending facts and circumstances, that
the spur tracks in question are a part of the carriers terminal facilities, to the same extent as the stations, team
tracks, and freight sheds, are conclusive upon the courts.

The findings of the Commission are not only in accord
with the facts before it, but they are also in accord with
the express provisions of the Act to Regulate Commerce,
as well as with certain well considered judicial decisions,—
all of which the Commerce Court ignored. See § 7 of the
act approved June 18, 1910, 36 Stat. 539, 544, 545, which
reënacted, in its original form, § 1 of the act of June 29,
1906, 34 Stat. 584; *Vincent* v. *Chicago & Alton R. R. Co.,*
49 Illinois, 33, 41; *Chicago & North West. Ry. Co.* v. *The
People,* 56 Illinois, 365, 382; *Coe & Milsom* v. *Louis. &
Nash. R. R. Co.,* 3 Fed. Rep. 775, 778; *Covington Stock-
Yards Co.* v. *Keith,* 139 U. S. 128, 135.

The case at bar is not that of a carrier making delivery "to a point off its line" by means of a terminal company, for which it is entitled to make an extra charge, as in *Int. Com. Comm.* v. *Stickney*, 215 U. S. 98.

The present controversy is limited to the single question of the right of the appellees to make an extra charge for deliveries made on spurs which constitute a part of their terminals, tracks, facilities, and equipment. The carriers established, and for many years maintained, the practice of making deliveries on the spurs as a part of their terminals and facilities. The shippers have, at all times, acquiesced in that practice. On complaint duly filed, and after a full hearing, the Commission dealt with the practice in all of its aspects. Its order, in pursuance of its investigation, is a mere regulation. The terminal facilities of carriers, with these spurs as a part, have time and again been the subject of consideration by Congress. Against the judgment of the carriers, the shippers, the Commission, the Congress, and the courts, the Commerce Court, with its holding, stands alone.

It is manifest, from its report, that the Commission considered all of the facts and circumstances. No claim to the contrary is made. The Commission also considered the difference between the American and English systems of dealing with terminal services and charges. The findings of the Commission are also supported by facts of such common observation as to be within the scope of judicial knowledge. Without the use of the spurs as terminal facilities, all of the enormous carload tonnage into or out of Greater New York must be handled on a common team track, or in a common depot. The same situation would obtain at Chicago, Pittsburgh, and all other large terminals. The livestock, ore, coal, oil, lumber, grain, and all other carload freight, would be unloaded on a common team track, or in a common depot, and crudely handled by the consignees through the streets of the cities. That

the Commerce Court substituted its judgment, on these facts and circumstances, for that of the Commission, is beyond question. A comparison of the language used by the Commission with that of the court conclusively demonstrates it.

The Commerce Court reviewed the element of the so-called water competition, and substituted its judgment that the industrial track service is not the same as the team track or depot service, for the contrary judgment of the Commission. In doing so, the Commerce Court assumed an authority which this court, for the past ten years, has persistently condemned in every decision relating to the respective functions of the Commission and the courts.

The Commission found that these spurs and sidetracks were a part of the terminal facilities; that deliveries thereon were the same, in cost and character, as the deliveries on the public team tracks; that the line haul rates for all other shippers embraced, without additional charge, deliveries on the terminals; and that out of 10,000 cities in the United States where terminal services are performed, only in the cities of San Francisco, Los Angeles, and San Diego, was this spur track charge imposed. Having made these findings, the conclusion of the Commission that the extra charge was unlawful followed as a matter of course.

No justification is given for the extra charge of $2.50 for spur track delivery. The appellees are practically the only carriers who may compete for the freight, and it is easy for them to agree. When competition is inimical to their interests, they do not compete. When asked by the Commission why this charge was made at these points, the traffic manager of one of the roads replied, "Because we can get it." Another railroad official who appeared before the Commission explained the non-existence of such a charge at all other points on his line, as well as throughout

the country at large, by saying that the absence of such a charge was "a tribute to competition."

The Commerce Court held that "the ultimate conclusion of the Commission is a mixed question of law and fact which certainly ought not to be conclusive upon this court." But this court has held that even on a mixed question of law and fact the findings of the Commission are conclusive. *Ill. Cent. R. R. Co.* v. *Int. Com. Comm.,* 206 U. S. 441, 455, 459.

*Mr. P. J. Farrell* for the Interstate Commerce Commission.

*Mr. Fred H. Wood* and *Mr. Gardiner Lathrop,* with whom *Mr. Robert Dunlap, Mr. T. J. Norton, Mr. C. W. Durbrow, Mr. W. F. Herrin* and *Mr. J. P. Blair* were on the brief, for appellees.

There was no abuse of power in issuing injunction *pendente lite.*

The switching charge is not embraced in regular rate. It covers a special service rendered under special contract and separate charge therefor is legal.

There is no dispute as to meaning of tariffs.

The charge is imposed for special service not rendered to public in general and properly stated separately and in addition to freight rate.

The charge is separately stated in pursuance of § 6 of the Interstate Commerce Law.

There are other instances in which a separate charge has been imposed in addition to usual rate.

It is not obligatory upon a railway company to construct industrial spurs and deliver and receive freight thereon. Any obligation is wholly contractual and a separate charge for such service is proper.

The Government's cases are not in point.

The charge is not violative of § 2 of the act concerning unjust discriminations.

The charge was not found to be violative of § 3 of the act concerning undue preferences.

It is error to consider the supposed practice of railway companies, in general, making free deliveries at private industries, as they would not disclose the legal duties of carriers complained against under the Interstate Commerce Law, and the Commission was confined to ascertaining and determining whether these particular railway companies in making the charge complained of were doing or omitting to do something in contravention of some provision of that law.

It conclusively appears from the form of the order and the face of the Commission's report that the order is not based upon any finding of discrimination under either the second or third sections, but upon a construction of the statute which would forbid any carrier from separating its terminal and haulage charges on the same shipment.

The Commission's construction of the law is erroneous.

By the plain intendment of the language used, carriers performing a road service between termini may separately state the charges for carriage between places named in the tariffs and their own terminal services performed at the places between which such transportation is conducted.

' The Commission's construction is contrary to the purposes and scope of the statute as shown by its legislative history.

The Commission's construction is contrary to the construction of the English act at the time of the passage of the Act to Regulate Commerce.

In the construction of this statute no assumed custom of embracing within a single charge compensation for these two services can weigh against the plain reading of the statute and the contemporaneous construction of similar provisions in the English law.

In so far as the order is predicated upon any assumption that the cost of team track delivery and industry track

delivery is the same, it is based upon an assumption warranted by no finding of the Commission, contrary to the undisputed evidence before the Commission, and contrary to the specific allegation of the petition, admitted by the motions of appellants, that the cost of industry track delivery is greater than the cost of team track delivery.

Waiving the form of the order, the tariffs of the carriers in imposing a terminal charge for industry track delivery when made in connection with a line haul by the carrier making such delivery, while making no terminal charge for team track delivery incident to a line haul, violated no provision of the Act to Regulate Commerce.

The two services in question are not like services performed under similar circumstances and conditions; and the resultant difference in charges results in no undue preference, but is justified both by the dissimilar circumstances and conditions under which rendered, and by the added value of the service in connection with industry track delivery, for which it is just to make an additional charge.

In support of these contentions, see *Central Stock Yards Co. v. Louis. & Nash. R. R.*, 192 U. S. 568; *Chalk v. Charlotte &c. R. Co.*, 85 N. Car. 371; *Evershed v. London &c. R. Co.*, 2 Q. B. D. 254; *Fenner v. Buffalo &c. R. Co.*, 44 N. Y. 505; *Francis v. Dubuque &c. R. Co.*, 25 Iowa, 60; *Hall v. London & Brighton Ry. Co.*, 15 Q. B. D. 505; *Imperial Wheel Co. v. St. L., I. M. & S. Ry.*, 20 I. C. C. 56; *Import Rate Case*, 162 U. S. 197, 219; *In re Investigation of Coal Rates*, 22 I. C. C. 604; *Int. Com. Comm. v. Balt. & Ohio R. R. Co.*, 225 U. S. 326; *Int. Com. Comm. v. Balt. & Ohio R. R. Co.*, 145 U. S. 284; *Int. Com. Comm. v. Chicago G. West. Ry. Co.*, 209 U. S. 108; *Int. Com. Comm. v. Louis. & Nash. R. R. Co.*, 227 U. S. 88, 100; *Int. Com. Comm. v. Stickney*, 215 U. S. 98; *McNeill v. Southern Ry. Co.*, 202 U. S. 543; *Minnesota Rate Cases*, 230 U. S. 352; *Missouri Rate Cases*, 230 U. S. 474; *New Orleans &c. R. Co. v. Tyson*, 46 Mis-

sissippi, 729; *Party Rate Case,* 145 U. S. 284; *Ralston Town-
site Co.* v. *M. P. Ry.,* 22 I. C. C. 354; *South &c. Ala. R. Co.*
v. *Wood,* 66 Alabama, 167; *State* v. *Republican Valley R.
Co.,* 17 Nebraska, 647; *Tex. & Pac. R. R. Co.* v. *Int. Com.
Comm.,* 162 U. S. 197, 219; *Witbeck* v. *Holland,* 45 N. Y.
13; *Winters Paint Co.* v. *C., M. & St. P. Ry.,* 16 I. C. C.
587; *Union Pacific R. R. Co.* v. *United States,* 117 U. S. 355;
*United States* v. *Balt. & Ohio R. R. Co.,* 231 U. S. 274.

MR. JUSTICE HUGHES delivered the opinion of the court.

The Atchison, Topeka and Santa Fe Railway Company,
the Southern Pacific Company and the San Pedro, Los
Angeles and Salt Lake Railroad Company, brought this
suit against the Interstate Commerce Commission in the
Circuit Court of the United States for the District of Kan-
sas, first division, to restrain the enforcement of an order
of the Commission made in April, 1910. The order re-
quired these companies to desist 'from exacting their
present charge of $2.50 per car for delivering and receiving
carload freight to and from industries located upon spurs
and sidetracks within their respective switching limits' in
Los Angeles, California, when such carload freight 'is
moving in interstate commerce incidentally to a system-
line haul.' It also prohibited the exaction of any charge
whatever, other than the charge for transportation from
points of origin to destination, for delivering or receiving
carload freight in such cases.[1]

---

[1] The order is as follows:

"This case being at issue on complaint and answer on file, and hav-
ing been duly heard and submitted by the parties, and full investiga-
tion of the matters and things involved having been had, and the com-
mission having, on the date hereof, made and filed a report containing
its findings of fact and conclusions thereon, which said report is hereby
referred to and made a part hereof, and having found that the present
charge of $2.50 per car exacted by the several defendants for delivering

After answer had been filed by the Commission, the suit was transferred to the Commerce Court, and the United States, the Associated Jobbers of Los Angeles and the Pacific Coast Jobbers' and Manufacturers' Association, intervened. The United States thereupon moved to dismiss the bill for want of equity and the petitioners asked for a preliminary injunction. The Commerce Court, denying the Government's motion, suspended the Commission's order until the further order of the court (188 Fed. Rep. 229, 929); and this appeal is prosecuted.

The complaint of the petitioners in substance is that they have established in the city of Los Angeles their public terminals, including what are known as team tracks and freight sheds, for the accommodation of the public in receiving and delivering carload freight; that these facilities are entirely adequate for the purpose, and are

and receiving carload freight to and from industries located upon spurs and sidetracks within their respective switching limits at Los Angeles, Cal., when such carload freight is moving in interstate commerce incidentally to a system-line haul, is in violation of the act to regulate commerce:

"It is ordered, That said defendants be, and they are hereby, notified and required to cease and desist, on or before the 1st day of July, 1910, and for a period of not less than two years thereafter abstain, from exacting their present charge of $2.50 per car for delivering and receiving carload freight to and from industries located upon spurs and sidetracks within their respective switching limits in the said city of Los Angeles, Cal., when such carload freight is moving in interstate commerce incidentally to a system-line haul.

"It is further ordered, That said defendants be, and they are hereby, notified and required to cease and desist, on or before the 1st day of July, 1910, and for a period of not less than two years thereafter abstain, from exacting any charge whatever, other than the charge for transportation from points of origin to destination, for delivering or receiving carload freight to or from industries located upon spurs or sidetracks within their respective switching limits in the said city of Los Angeles, Cal., when such carload freight is moving in interstate commerce incidentally to a system-line haul."

sufficient to handle all the carload freight shipped or de-
livered in the city, including that now received or delivered
upon the industrial spur tracks in question; that the spur-
track service has been established simply for the conven-
ience of the shippers thus served; that it is a service es-
sentially distinct from the line haul, and additional thereto,
being of great benefit in the saving of cartage charges to
the favored shippers for whose use the spur tracks were
constructed; that the industries or plants located upon the
spurs are distant from the main tracks, in the case of the
Atchison Company from 1-5 mile to 3½ miles, in that of
the Southern Pacific Company from 200 feet to 7 miles,
and in that of the San Pedro Company from 1-5 mile to
4 miles, and that the special switching service involves a
much greater expense than if the carload freight were re-
ceived or delivered on the team tracks or at the freight
sheds of the carriers respectively; that the charge of $2.50
per car for this service is entirely reasonable and one which
the carriers are entitled to make in addition to the line-
haul rate; and that as such it has been duly specified in
their published tariffs. It is also averred that, while in
the contracts governing the construction and maintenance
of the spur tracks no specific sum was prescribed for the
service of receiving and delivering carload freight thereon,
the charge above mentioned had been generally estab-
lished; that at the time of the making of these contracts
the shippers understood and willingly consented that,
if the railway company performed this special service,
there should be additional compensation and that such
charge has generally been maintained and collected.
The adequacy of the public terminal facilities for carload
freight in Los Angeles (consisting of the team tracks and
freight sheds of the carriers respectively), the facts set
forth with respect to the construction of the spur tracks,
their location, the acquiescence in the switching charge
and its maintenance, were established before the Com-

mission, it is alleged, by undisputed evidence. It is further stated that on account of water and other competition, the rates of transportation to and from Los Angeles have been forced to an exceedingly low basis so that the companies do not receive the amount to which they are justly entitled and that they ought not to be required to perform the service in question without reasonable reward. The Commission's order was assailed as beyond its authority, involving a discrimination in favor of the owners of plants located upon the spur tracks and a deprivation of the property of the carriers without due process of law.

The report of the Commission (18 I. C. C. 310) was made a part of the bill. It appears that the proceeding before the Commission was instituted by the Associated Jobbers of Los Angeles and was directed against two distinct practices, involving the spur-track switching charges incident to a system-line haul and to a foreign-line haul respectively. The propriety of such a charge when the line haul was by a foreign carrier was sustained, and the prohibitory order was confined to cases where the charge was made in connection with a system-line haul. The pertinent facts as found by the Commission are substantially as follows:

Each of the carriers has designated certain territory as within its switching or yard limits in the city of Los Angeles, extending for 6 or 7 miles in a general easterly and westerly direction, and including numerous tracks, main lines, branch lines, industry spurs, classification tracks, team tracks, freight-shed tracks, hold tracks, repair tracks, and others, and also their stations, freight sheds, derricks, roundhouses, and other structures. Freight moving in carloads is delivered at team tracks, at freight sheds, or at industry spurs. At team tracks and freight sheds no charge is imposed for the receipt or delivery of such carload freight over the freight rate named in the tariffs, while at industry spurs an additional

charge of $2.50 is imposed on every loaded car moving either in or out. These industry spurs vary in length, some leading directly from the main track into or alongside of the industries served, while others are of greater length and branch at one or more points, short spurs running off from what is known as the 'lead' to serve other industries in the immediate neighborhood. These spurs have been constructed under substantially uniform contracts.[1] None of the industries at Los Angeles fur-

---

[1] The standard form of the Southern Pacific Company provides as follows:

"1. Undersigned (shipper) will pay cost of constructing above-described track (rails, splices, bolts, switches, frogs, switch stands, and connections to be furnished by and at the cost of Southern Pacific Company), whether such cost may be more or less than amount of foregoing approximate estimate.

"2. Said track shall be under full control of Southern Pacific Company, and may be used at discretion of said company for shipments or delivery of any freight, but the business of the undersigned shall always have preference.

"3. All material in said track furnished at expense of Southern Pacific Company, whether in original construction or by any way of replacements or repairs, shall be and remain exclusive property of Southern Pacific Company, and said Southern Pacific Company shall keep said track in repair.

"4. In case said track shall not be used by undersigned for period of one year, said Southern Pacific Company may, at its option, remove said track.

"5. All goods shipped from or to said track by rail, routing of which is controlled, or may be reasonably held to be controlled, by or through undersigned, shall, when forwarded, be over such railroads as may be selected by Southern Pacific Company, provided rate of charge shall be as low as that from or to point in question by any other rail route."

The Sante Fe contract contains this provision:

"The title to said track, and to all the rails, ties, bolts, switches, fastenings, and fixtures connected therewith, and to all other property which may be furnished by the railway company in the maintenance of said track, shall at all times be and remain in said railway company, and said railway company may use the same for other purposes than the delivery of freight to or the receipt of freight from the second

nishes its own motive power, and interline switching is done from the interchange track to the industry by the locomotives of the delivering line, the carrier performing the switching service.

The Commission found that these spur tracks were portions of the terminal facilities of the carriers with whose lines they connected, being distinguished from mere plant facilities such as were under consideration in *Chicago & Alton Ry. Co.* v. *United States*, 156 Fed. Rep. 558, and in the cases of the *General Electric Company* and *Solvay Process Company*, 14 I. C. C. 237, 246. Each of the spurs here considered, said the Commission, is in a real sense a railroad terminal at which the carrier receives and delivers freight. It further appears from the report that the charge for spur-track delivery has been made by all of the carriers at Los Angeles as long as the railroads have had access to that city; that it was first imposed by the Southern Pacific and as the other lines came in they adopted the policy of the line already there; that as to certain commodities the charge was not imposed until quite recently and at all times until the Hepburn Act went into effect there was great variation in charge as between individual shippers. It is added that there are 97 places in California to which what are known as coast terminal rates apply, rates lower than to intermediate points; only in Los Angeles, San Franciso and San Diego is there such a charge for spur-track delivery, though in many of these places such delivery is furnished. To the north, in Portland, Seattle, Tacoma, and a large number of other points which also enjoy coast terminal

party, provided that such use shall inconvenience the business of the second party as little as possible consistent therewith; and at any time after the termination of this contract or the obligation of the railway company, as herein provided, to maintain such track, the railway company shall have the right to remove said track and every part thereof."

rates, the Southern Pacific, Northern Pacific and Great
Northern lines, impose no such charge, and to the east
where defendants' lines have their termini in cities compet-
ing with Los Angeles, this charge is also unknown.

The Commission thus described the character of the
service in question: "Spur-track delivery is a substitute
service, a service which it has solicited the right to give,
as the evidence here shows, a service which costs the in-
dustry for the installation of the track and the use of its
property as a railway terminal. It is a service over the
carrier's own rails to a point where it yields possession of
the property transported and which involves no greater
expense than would team-track delivery. It relieves the
carrier's team tracks and sheds, necessitating less outlay
for expense of yards in a crowded city, promotes the
speedy release of equipment, and vastly aids in conduct-
ing a commerce which is greater than the carrier's own
facilities could freely, adequately, and economically
handle.

"Again it is not to be overlooked that the delivery given
on an industry spur is not supplemental to any other de-
livery. Cars destined to industry spurs are not placed
first at a spur, depot, or on the team tracks, or at the sheds,
and later switched to oblige the consignee. A train of
freight cars goes to the breaking-up yards which lie at
the entrance to the city, and there it is divided up with
respect to the character of the freight in the various cars
and their destination. No one has access to the cars at
this point. This yard is purely a railroad facility. After
the cars are segregated they are taken to the tracks to
which they are ordered—some to the various team tracks
distributed along the main line, some to different industries,
some perhaps to the railroad shops or to freight sheds or
to the stock yards. Before the cars are placed the con-
signees are given notice of the tracks to which they are
to be sent, so that there is no confusion, and the switch

engines which place the cars on one track also serve to haul the 'loads' in and 'empties' out at the other tracks. After a most exhaustive inquiry we cannot find, taking this service as a whole in the same way that it is treated by the carriers, that the service is more expensive to the carrier than if all cars were given team-track delivery.

"An additional charge may be made when an additional service is given. But the service here given is not additional to that for which the rate pays. If the shipper pays for team-track delivery and does not receive it, but asks instead and is given a sidetrack delivery which costs the carrier no more, he may not be compelled to pay an additional charge upon the assumption that he has received a terminal team-track service which has not been given. A carrier may not so construct its rates as to compel an extra charge for like service, and this, in our judgment, the defendants at Los Angeles have done." 18 I. C. C. pp. 317, 318.

1. It is urged that the Commission's order rests upon a construction of the statute which would forbid any carrier from separating its terminal and haulage charges on the same shipment, and that this is a fundamental misconception of the law.

We do not think that the order is open to this objection. It is true that the Commission directed attention to the distinction between the American and English methods of stating rates, pointing out that the English practise of fixing separate schedules for 'conveyance' and 'station terminal' rates had not obtained in this country so far as the records of the Commission show. The opinion was expressed that the provisions of the Act to Regulate Commerce were enacted with reference to the American method of rate-making and that the rate which the statute requires to be published is 'a complete rate,' including 'not only the charge for hauling but the charge for the use of

the terminals at both ends of the line.' 18 I. C. C. pp. 315, 316. We need not stop to consider whether this is a correct interpretation of the act, for the question of a segregation of haulage and terminal charges (meaning, by the latter, charges for the use of ordinary terminal stations in receiving and delivering goods) was not before the Commission and its propriety was not necessarily involved in the decision. No such segregation had been attempted by the carriers here. On the contrary, it was undisputed that the line haul carload rate comprehended receipt and delivery on team tracks or at freight sheds.

The Commission conceded the right of the carrier to charge for any terminal service that was accessorial. But it was held that an additional charge was not justified if additional service was not in fact rendered.

2. Nor do we understand that the Commission ruled that the receipt and delivery of goods at plants located upon spurs or side-tracks could not, in any circumstances, be regarded as a distinct service for which separate compensation might be demanded. Cases of an interior movement of plant traffic to and from various parts of the establishment, and of deliveries through a system of interior switching tracks constructed as plant facilities, were expressly distinguished by the Commission (18 I. C. C. pp. 313, 314); and it is apparent that the ruling of the Commission would not apply in any case where by reason of the location and extent of the spur tracks and the character of the movement the facts were essentially different from those upon which the decision was based. (*Interstate Commerce Commission* v. *Stickney*, 215 U. S. 98, 105.)

3. On the other hand, it cannot be maintained that the delivery and receipt of goods on industrial spur tracks within the switching limits in a city is necessarily an added service for which the carrier is entitled to make, or should make, a charge additional to the line-haul rate to

or from that city, when the line-haul rate embraces a receiving and delivering service for which the spur-track service is a substitute. It is said that carriers are bound to carry only to or from their terminal stations. But when industrial spur tracks have been established within the carrier's switching limits, within which also various team tracks are located, these spurs may in fact constitute an essential part of the carrier's terminal system. It was stated by the Commission that carriers throughout the country treat industry spurs of the kind here in question 'as portions of their terminals, making no extra charge for service thereto when the carrier receives the benefit of the line haul out or in.' It was added that while this general statement covered perhaps ten thousand cities and towns in the United States, the carriers before the Commission could name only three exceptions, to wit, the cities of Los Angeles, San Francisco and San Diego. But, laying the generalization on one side, it is plain that the question whether or not there is at any point an additional service in connection with industrial spur tracks upon which to base an extra charge, or whether there is merely a substituted service which is substantially a like service to that included in the line-haul rate and not received, is a question of fact to be determined according to the actual conditions of operation.

Such a question is manifestly one upon which it is the province of the Commission to pass.

4. We must therefore take the findings of the Commission in the present case as to the character and manner of use of the industrial spurs in Los Angeles—that they constituted part of the carrier's terminals and that under the conditions there existing, the receipt and delivery of goods on these spurs was a like service as compared with the receipt and delivery of goods at team tracks and freight sheds—as conclusions of fact. Assuming that they were based upon evidence, they are not open to review. *Balti-*

*more & Ohio R. R. Co.* v. *Pitcairn Coal Co.*, 215 U. S. 481, 495; *Interstate Commerce Commission* v. *D., L. & W. R. R. Co.*, 220 U. S. 235, 251; *Interstate Commerce Commission* v. *Union Pacific R. R. Co.*, 222 U. S. 541, 547, 548; *Interstate Commerce Commission* v. *Louisville & Nashville R. R. Co.*, 227 U. S. 88, 92; *Atchison, Topeka & Santa Fe Rwy. Co.* v. *United States*, 232 U. S. 199, 221.

In this view, we find no ground for holding the order of the Commission to be invalid. It is not denied that the complaining shippers and these carriers were heard before the Commission and that evidence disclosing the terminal situation in Los Angeles, and the nature and use of the various tracks within the switching limits, was presented; and it cannot be doubted that the case demanded an appreciation of a variety of details, or minor facts, in order that the ultimate questions of fact could be determined. It is said that it was established by undisputed evidence that the team tracks and freight sheds provided by the carriers were fully adequate for all carload freight. Putting aside the denial by the Commission of this allegation, it is evident that the question was not simply as to such adequacy, but as to the actual use of the various tracks, the services thereon relatively considered, and whether there was really an extra service in the circumstances shown. Again, it is said that the Commission did not find the switching charge in itself, that is, taken separately, to be unreasonable, but the inquiry was whether in view of the conditions of the distribution of the carload freight through a large area there was in fact such a similarity of movement as to negative the basis for a separate charge. It is further urged that while the contracts for the construction of these spurs did not fix the charge, it was proved by undisputed evidence that at the time these contracts were made the shippers consented to a special charge, if freight were received and delivered thereon, and that the charge in question had been generally

maintained. The service, however, was performed subject to the law of the land requiring that the carrier's charges should not be unreasonable or unjustly discriminatory. (See *Louisville & Nashville R. R. Co.* v. *Mottley*, 219 U. S. 467, 482; *Phila., Balt. & Wash. R. R. Co.* v. *Schubert*, 224 U. S. 603, 613, 614.) If it became apparent that the shippers were subjected to an arbitrary and unwarranted exaction, they were in no way estopped from bringing the matter before the body created by law to deal with such questions and from securing its order directing the carriers to stop the objectionable practise.

But it is contended that the finding of the Commission is opposed to the admitted physical facts, and reference is made to the transportation to and from industrial plants located from 1-5 of a mile to 7 miles from the main track of the carrier. We find no such fundamental unsoundness in the Commission's conclusions. It appeared, as already stated, that the carrier had designated certain territory as within its switching or yard limits in Los Angeles extending for 6 or 7 miles and 'including numerous tracks, main' lines, branch lines, industry tracks, team tracks, freight-shed tracks and various structures.' It does not appear how many industries were within a short distance or to how many the statement as to the greatest distance above-mentioned applied. The carrier did not fix a charge according to the comparative service in the case of these various industrial plants. It made the same switching charge whether the distance was 200 feet or 7 miles, that is, it dealt with the situation upon an average basis making the same charge for all this switching in a given area which constituted its terminal district. It was the service within these switching limits, that the Commission was considering. Manifestly it was permissible to establish such a district, and taking the team-track and freight-shed service in that area, and the average spur-track service, the Commission reached the conclusion set forth. It is said

that the finding of the Commission as to the comparative cost of the service was not affirmative, but was merely a negative statement to the effect that the Commission was unable to find that the cost of spur-track delivery was more expensive to the carrier. While this form of expression was used at one place in the Commission's report, at another the service in question was described as one which involved 'no greater expense than would team-track delivery' and we cannot but regard this as the Commission's finding upon the evidence. It is then insisted that the contrary of: this finding is self-evident, but the facts with respect to the movement of freight in a great terminal district are by no means so simple that the deliberate judgment of the Commission can be regarded as contradicting the obvious.

The argument for the petitioners necessarily invites the court to substitute its judgment for that of the Commission upon matters of fact within the Commission's province. This is not the function of the court. We cannot regard the Act to Regulate Commerce as justifying an increased or extra charge for a substantially similar service and upon the case made it cannot be said that the Commission has overstepped its authority in forbidding the charge in question as one which was unjustly discriminatory.

In our opinion the Commerce Court erred in denying the Government's motion to dismiss and in granting the petitioners' motion for injunction. The order of the Commerce Court is therefore reversed and the cause is remanded to the District Court of the United States for the Southern District of California, southern division, with instructions to dismiss the bill. Act of October 22, 1913, c. 32; Stat. 1913, p. 221.

*It is so ordered.*