# CHARLESTON.

ZENITH SAND COMPANY *v.* PUBLIC SERVICE. COMMISSION

(No. 6420)

Submitted January 8, 1930. Decided January 14, 1930.

*R. F. Dunlap* and *W. A. Brown,* for petitioner.

*Fitzpatrick, Brown & Davis* and *C. W. Strickling*, for C. & O. Ry. Co.; *W. E. R. Byrne,* for Pfaff & Smith Builders Supply Co. and W. Va. Sand & Gravel Co.; *F. W. Livezey,* for Public Service Commission of West Virginia.

HATCHER, JUDGE:

The petitioner ships sand and gravel from a plant located near St. Albans, West Virginia. Certain of its competitors have plants located within the Charleston terminal district of the Chesapeake & Ohio Railway Company (hereinafter referred to as the C. & O.). All industries within that district are charged with outgoing freight over the C. & O. from its passenger station at Charleston, no matter the distance therefrom (within the district) where the freight originated. In rate language the switching charges are "absorbed" by the C. & O. As St. Albans is eleven miles west of the C. & O. passenger station at Charleston, a shipper at St. Albans necessarily pays a higher rate on freight going east, than is paid on like shipments from Charleston. The plants of petitioner's competitors in Charleston are located on the New York Central Railroad (hereinafter referred to as the N. Y. C.) and are several miles from the C. & O. passenger depot. Under the grouping arrangement referred to no charge is made by the C. & O. for hauling and having the N. Y. C. haul the competitive freight to the C. & O. main line. (It "absorbs" the switching charge of $3.60 a car made on such freight by the N. Y. C.) The petitioner contends that this arrangement enables its competitors to undersell it to eastern customers, is prejudicial and discriminatory, and that the C. & O. should be required to collect switching charges from the competitors.

The grouping arrangement by the C. & O. at Charleston and its absorption of switching charges are justified by the Public Service Commission as follows: "It is the practice of carriers to compute all mileages from a given point within any terminal, and generally speaking this point is located on the main line. No difference exists in this practice at Charleston from the practice in general use by the common carriers of the country as pointed out in the evidence. To attempt to compute mileages from all sidings in a switching terminal would result in an intolerable situation, and, by creating disparities in rates of shippers of the same commodity from the same industrial district, it would result in complications in freight traffic that would disrupt the ship-

ping from all such districts, as well as shipping to them, where rates on sand and gravel and other commodities are made on the basis of a mileage scale. Mileages from the complainant's (petitioner's) plants are computed by the identical method in use at Charleston and elsewhere throughout the country. The practice for which the complainant contends has never been adopted anywhere, so far as the evidence in this case and the investigation of the Commission's rate expert disclose.

The principle of the absorption of switching charges is universally recognized as necessary to place on the same rate parity all individuals, firms and industries located within the defined limits of a switching terminal, thereby permitting traffic to move to all points without burdening any shipper with any disadvantage on account of the location of his plant within the limits of the switching terminal. It is in the interest of the public in that it results in the expansion of the industrial limits of a community affected by it. In a community as large as Charleston, and served by more than one carrier, it is not practical or desirable for all industries to be located on and served by the line of any one railway. The Chesapeake and Ohio Railway's absorption tariff makes no distinction between individuals, firms or industries, and it offers no benefit to any one shipper that is not available to all shippers under the same or substantially similar circumstances and conditions. The West Virginia Sand and Gravel Company and the Pfaff & Smith Builders Supply Company (competitors of petitioner) are accorded no different treatment than is afforded other shippers having private sidings located within the defined switching district at Charleston on either the New York Central, the Chesapeake and Ohio or the Baltimore and Ohio tracks."

This view is in strict accord with that of the Interstate Commerce Commission and has been upheld by the Supreme Court of the United States. In *Stiritz* v. *N. O. M. & C. R. R. Co.*, 22 I. C. C. 578, 581, the Commission said that it had "repeatedly recognized and approved the grouping of points within reasonable limits for the purpose of making rates."

In *Avery Mfg. Co.* v. *A. T. & S. F. Ry. Co.*, 16 I .C. C. 20, 24, the Commission recognized that group rates should be made "with a reasonable disregard of distance and with close attention to commercial conditions." This proposition was elaborated in *C. L. & C. Co.* v. *T. S. Ry. Co.*, 16 I. C. C. 323, 334, as follows: "In all cases of blanket or group rates there is of necessity more or less disregard of distance and varying degrees of inequality, but such inequalities are not of necessity unreasonable or unjust when the situation is viewed from every standpoint, taking into account all interests." In *K. C. T. B.* v. *A. T. & S. F. Ry. Co.*, 16 I. C. C. 195, 203, the Commission condemned the very principle of rate making proposed by petitioner, saying "while we are not to be understood as intimating that substantial differences in distance are not to be given consideration, we are not willing to accept the theory of rate construction based purely on distance. Such adjustment would be revolutionary and destructive to established commercial interests of enormous volume and value." In *A. J. of L. A.* v. *A. T. & S. F. Ry. Co. et al.*, 18 I. C. C. 310, 314, 325, the Commission required the carrier to absorb the switching charges on line haul freight received or delivered within its terminal district, saying that such was "the universal practice in this country." This order was sustained in *The Los Angeles Switching Case*, 234 U. S. 294, the Supreme Court saying: "It is permissible for a railway company to establish a terminal district; and it is for the Commission to determine according to the actual conditions of operation, whether an extra charge for spur track delivery within that district regardless of the variations in distance is either unreasonable or discriminatory." The powers of the Interstate Commerce Commission in such cases are no broader than the statutory authority of our Public Service Commission. See Code, Chapter 15-0, section 8. The possibility of "just discriminations and reasonable preferences" under the Commerce Acts is recognized by the Supreme Court in *I. C. C.* v. *B. & O. Rr.*, 145 U. S. 263, 277. Therefore, the mere fact that the C. & O. Charleston group rate works a hardship on the petitioner is not alone sufficient to sustain its

demand. Our Commission has sanctioned that rate and we find no valid reason for disturbing it.

. The petitioner further contends that station 956, which is the number designated in the C. & O. Tariff lists as Charleston, is in reality the C. & O. freight station, which is about six miles from the passenger station. This contention is based on a failure of the witness Kelly either to understand some of the questions asked him, or to express himself clearly at all times. His whole evidence establishes the fact that for many years mileage on freight has been calculated from the passenger station and that 956 has been the number applied thereto.

The ruling of the Commission is accordingly affirmed.

*Affirmed.*