McDonald and another, Copartners, Respondents, vs. Chicago & North Western Railway Company, Appellant.

*March 2—March 31, 1936.*

For the appellant there was a brief by *J. F. Baker* and *Llewellyn Cole,* both of Milwaukee, and oral argument by *Mr. Cole.*

For the respondents there was a brief by *Evrard & Evrard* and *A. M. McComb,* all of Green Bay, and oral argument by *Mr. McComb.*

ROSENBERRY, C. J.   The controversy in this case involves two questions: (1) Was the defendant obligated to deliver cars on the Larsen Canning Company track before payment of freight as demanded by the plaintiffs?   (2) If it was so obligated and refused to deliver the cars on said track and

tendered delivery at another point on its tracks in Green Bay, what damages, if any, may the plaintiffs recover?

There are three statutory methods prescribed by which a shipper may have made available to him the use of a track as a plant facility (sec. 190.16, Stats.) : (1) A railroad company may provide such a spur track; (2) an owner of an industry may at his own expense build a spur track which the railroad company is obligated thereafter to maintain and operate; (3) a railroad company may be required to obtain a right of way and construct and maintain a spur track upon certain conditions. The plaintiffs were not entitled to the service they demanded under any of these statutory provisions.

It appears that some time previous to the transactions involved in this case the plaintiffs had attempted to secure trackage rights by obtaining a lease of certain premises from the defendant, but the defendant declined to enter into such an arrangement for the reasons given by it. After an unsuccessful attempt to make an arrangement with the railroad company, the plaintiffs leased from the Larsen Canning Company on a month to month lease certain premises adjacent to a spur track owned and controlled by the defendant company. The Larsen Canning Company had no trackage rights which it could confer upon the plaintiffs and attempted to confer none. When cars arrived in the yards of the defendant company for the plaintiffs, the plaintiffs requested that the cars be spotted on the sidetrack in question. Between twenty and thirty cars had been so handled. Prior to the 16th of October, 1929, the plaintiffs had not promptly paid their freight bills. They had also placed a wood-sawing machine across the track in question, and had failed to pile the materials received so as to give necessary clearance to insure safety of employees, and the plaintiffs had been notified by the defendant that it would no longer accommodate them by spotting cars at that point. When the cars in question arrived at Green Bay, it is undisputed that the defendant notified the

plaintiffs of their arrival, whereupon the plaintiffs notified the defendant that until the cars were spotted the freight would not be paid. This was on the day on which the cars were received. The defendant then called up the plaintiffs and notified them that the cars could not be spotted for the reasons given, and the defendant was again advised that the freight would not be paid until the cars were spotted. The cars were placed upon a team track accessible to the plaintiffs, but not as convenient as they would have been had the cars been spotted on the spur track as plaintiffs demanded.

On October 22, 1929, the defendant wrote the plaintiffs, advising of the amount of the freight charges on each car and requesting them to make payment, and advised them that demurrage was accruing. On October 24th, Mr. Hollister, the local agent of the defendant, had a conference with Mr. McDonald, and on October 31, 1929, wrote the plaintiffs advising that demurrage had now reached $43 per car. In response to this letter, and under date of November 1, 1929, the plaintiffs wrote the defendant:

"Yours of October 31st re: car C. 129376 and 59572.

"As stated we cannot unload on your team track and had your office not refused to spot these cars where they belong, this unreasonable amount of demurrage would not have accumulated.

"We will accept them on our track, pay freight charges as soon as you agree to spot."

On the same day the defendant wrote the plaintiffs that the defendant could not cancel the demurrage charges, and, because previous freight bills had not been paid within the prescribed forty-eight-hour period, cars would not be placed until the freight charges and demurrage were settled.

Replying to this letter under date of November 4, 1929, the plaintiffs, after repeating that the plaintiffs had asked the cars to be spotted, closed their letter by saying:

"We will pay the freight but we must have them spotted where we can unload them."

The cars were not spotted. The freight and demurrage were not paid. Eventually the cars were unloaded, and the plaintiffs claim that the defendant's refusal to spot the cars under the circumstances amounted to a conversion of the property.

The cars in question were accepted by the defendant under the uniform straight bill of lading, not negotiable, by the terms of which the defendant was required "to carry [freight] to its usual place of delivery at said destination."

The uniform straight bill under which the goods were shipped provides:

"Except in those instances where it may lawfully be authorized to do so, no carrier by railroad shall deliver or relinquish possession at destination of the property covered by this bill of lading until all tariff rates and charges thereon have been paid."

The case here turns upon the narrow question of whether or not the goods were delivered in accordance with the contract of carriage, and that in turn depends upon whether or not that part of the spur track adjacent to the premises rented from the Larsen Canning Company was the usual place of delivery. There is very little discussion in the cases about the meaning of the term "usual place of delivery."

Some light is thrown upon the meaning of the term "usual place of delivery at said destination" by historical consideration of the duty of the carrier. When horse-drawn vehicles were used for transportation, the carrier hauled goods transported to the home or place of business of the consignee where it could be personally delivered to him. In case of water transportation, personal delivery not being possible by ship, delivery was made to the nearest wharf. With the advent of railroads, it was impossible for the equipment to move beyond the railway tracks. Under such circumstances, the railroad companies were required to provide facilities for the storage of the shipment, which they did by the erection of warehouses or freight depots. The unloading of heavy

freight not being practicable, it was ordinarily delivered on team tracks directly from the car. These facilities are undoubtedly what is referred to as the usual place of delivery being the place provided by the company for the delivery of freight transported by it. There gradually evolved the construction of spur tracks to industries to save cartage charges, and in some instances railroad companies attempted to make an additional charge for delivery on an industrial track. See *Interstate Com. Comm. v. Atchison, T. & S. F. R. Co.* 234 U. S. 294, 34 Sup. Ct. 814, 58 L. Ed. 1319, and *New York Cent. & H. R. R. Co. v. General Electric Co.* 219 N. Y. 227, 114 N. E. 115; also 1 A. L. R. 1425.

In *Scovern v. Chicago, M. & St. P. R. Co.* 189 Ill. App. 126, 131, the court said:

"The said provision is plain and unambiguous. It does not change the destination specifically named in such bill. It was intended to protect the railway company from being required to deliver the cars at a place *at the destination* other than its usual place of delivery."

In that case the bill of lading specified the place of shipment as the "Morgan Street Team Track, Chicago, Ill." The defendant railroad company claimed that under its bill of lading it had a right, following a custom, to deliver a car of cabbage at the "holding and inspection tracks at Western avenue." The court held that the specific provision of the contract controlled and that the consignee could not be required to inspect the goods at the Western avenue tracks two and one-half miles distant from the place designated in the bill of lading.

It is necessary to consider the situations to which the language is ordinarily applicable when goods are shipped in less than carload lots. The usual place of delivery is a warehouse or, in case of heavy freight, some convenient place on railroad grounds. The railroad company is required under the law to provide such facilities, and they constitute a part of

its transportation facilities. Heavy freight, such as lumber, stone, grain, is ordinarily received on tracks provided for that purpose. The cars in question were placed upon a team track accessible to the plaintiffs for unloading. The question is, Could the plaintiffs condition payment of the freight charges upon cars being first spotted adjacent to their premises on a spur track owned by the railroad company? It appears that even as to previous shipments the plaintiffs when notified had requested that the cars be spotted. The request was complied with as a matter of convenience and courtesy on the part of the defendant company to its shipper. There is no law, no rule, nor regulation of the company, so far as we have been able to discover, that authorizes a shipper to designate a point on a particular spur track and require the placing of cars at that point as a condition of its paying the freight charges. The refusal of the defendant company to spot the cars as demanded by the plaintiff did not constitute a conversion of the property by the defendant. The railroad has never at any time nor at any point claimed any right of property in the goods. Although the plaintiffs made a written offer to pay the freight, the amount of the freight was never tendered nor was any attempt made to keep a tender good. There is some evidence to the effect that the plaintiffs made some offer of a check in payment, but, if made, the offer did not include the demurrage charges, and it does not appear that the check was in fact ever issued or tendered.

The plaintiffs were clearly in the wrong in pursuing the course which they followed in this case.

*By the Court.*—Judgment appealed from is reversed, and cause remanded with directions to enter judgment for the defendant company for the amount of freight, demurrage, and other lawful accrued charges.