Southern Railway Company, Appellant,

*v.*

C. L. Pentecost et al., Appellees.

(*Nashville,* December Term, 1959.)

Opinion filed December 11, 1959.

Clyde W. Key, Knoxville, Ferriss C. Bailey, Nashville, A. J. Dixon and Ray M. Van Hook, Washington, D. C., for appellant.

George Shuff, Nashville, for Tennessee Public Service Commission.

Harold Seligman, Nashville, for Shalite Corporation, Knox Concrete Products, Inc. and Southern Cast Stone Co., Inc.

MR. JUSTICE SWEPSTON delivered the opinion of the Court.

The determinative question in this case is whether or not by reason of the failure of the Southern Railway Company to include within its switching limits at Knoxville, Tennessee, the Shalite Corporation it is guilty of the violation of either or both of the two following statutory provisions:

T.C.A. sec. 65-512 provides as follows:

"*Special rate, rebate or drawback by common carrier or public service company prohibited—Preference in furnishing cars or motive power unlawful—Unjust discrimination.*—If any common carrier or public service company shall directly or indirectly, by any special rate, rebate, drawback, or other device, charge, demand, collect, or receive from any person a greater or less compensation for any services rendered in the transportation of any kind of property, or any person, or any service within this state than it charges, de-

mands, collects, or receives from any other person for a like service in transportation or service of a like kind under substantially like circumstances and conditions, and if such common carrier or such other public service company, make any preference between the parties aforesaid, in furnishing cars or motive power or otherwise, such common carrier or other public service company shall be guilty of unjust discrimination, which is prohibited and declared unlawful."

.T.C.A. sec. 65-514 provides as follows:

*"Preferences are unlawful.*—It shall be unlawful for any such corporation to make or give an undue or unreasonable preference or advantage to any particular person or locality, or any particular description of traffic or service, or to subject any particular person, company, firm, corporation, or locality, or any particular description of traffic or service to any undue or unreasonable prejudice or disadvantage."

The Tennessee Public Service Commission held that the Railway Company, sometimes hereinafter referred to as the Southern, was guilty of violating said Code sections and in effect ordered the Southern to place Shalite Corporation within the switching limits of Knoxville, in order that the latter might obtain the benefit of a cheaper rate. The Southern petitioned a writ of certiorari and supersedeas in the Chancery Court, where the Chancellor held that there was material evidence to support the finding of fact made by the Commission and the petitions for writs were dismissed, as a result of which the Southern has appealed to this Court as provided by T.C.A. sec. 65-230.

Many questions are discussed in the briefs which we do not find it necessary to go into. We have examined the record carefully and we are convinced that there is no evidence to support the action of either the Commission or the Chancellor.

The record shows without contradiction the following facts:

The switching limits involved here, as well as switching limits generally, are not determined by any definite geographical boundary line such as the limits of a municipal corporation, but are determined by the particular railroad on the basis of the concentration of industry in a given locality, or localities, which will make it economically feasible and cost-saving to conduct switching operations to and from the different plants and the main line of the Railway to use switch engines and switching crews; and as a result of this saving, the same usually is passed along to the industries so located in these switching limits. The charge in this record is a flat per car charge of $18.09 irrespective of the weight, distance and kind of material being hauled, whereas the Shalite Corporation, which is not located in a concentrated industrial area and, as will appear later, is located on a siding of a double track main line and can not be served by a switch engine and crew; and the rate for this line-haul from Shalite to its two principal customers, Southern Cast Stone and Knox Concrete Products, intervenors herein, amounts to $33 per car of average load of 50 tons.

It is recognized by both parties that it is within the discretion of a carrier to decide what industries are to be included and those to be excluded within switching limits, so long as unjust discrimination and undue prejudice

are avoided. *Los Angeles Switching Case (Interstate Commerce Commission v. Atchison, Topeka, & Santa Fe Railway Company)*, 234 U.S. 294, 313, 34 S.Ct. 814, 58 L.Ed. 1319.

So let us look further into the undisputed evidence. The only alleged competitor of Shalite is Williams Lime Mfg. Co. Both Shalite and Williams sell their products to the two above-named intervenors who are manufacturers of concrete blocks. Shalite manufacturers a light weight material, 1600 lbs. per cubic yard, which sells for $4.71 per net ton and produces a light weight concrete block that commands a higher price by reason of its insulating and fire resistant characteristics, whereas the Williams Company sells a limestone sand, a byproduct, weighing 2500 lbs. per cubic yard, for $1.40 per net ton and it makes a heavier and not as good a concrete block as the Shalite material. The Williams Company is located within the switching limits.

The direct rail distance from Shalite to Southern Cast Stone is approximately 13 miles. The distance from Williams Company to Southern Cast Stone is 6 miles. The distance from Shalite to Knox Concrete is approximately 15 miles. The distance from Williams Company is 8 miles.

Exhibit No. 5, the map of the Railway System in the Knoxville area, shows that the Bristol Chattanooga line runs approximately east and west through the center of the City of Knoxville with the John Sevier yard to the east of the city. The switching limit extends to this yard. Coming off to the north from the John Sevier yard is a main double track line that goes up outside the city limits to the Shalite Corporation which has a

deadend siding coming off the west track and going south to the Shalite Corporation. Just above this siding the double track turns west and goes to a "Y" which is designated as Beverly and from this "Y" one branch goes to Middleboro toward the northeast and the other to the southwest to the area of the Coster Repair Shops yard, where it intersects a line that comes up from just west of the passenger station and the city yards through Coster yard and on up to Clinton and passes through a spot called Black Oak Ridge a short distance above the Coster Yards.

The distance from the city yard to John Sevier Yard is 7½ miles and from John Sevier to Shalite plant is 3 miles approximately. Due to the geographical location of Shalite's plant and traffic arrangement in that area, to transport empty cars from Sevier Yard necessitates handling a car some 40-odd miles. For example, with an empty car from Sevier Yard to Shalite plant, it is handled in the local train 3.44 miles. After the car is loaded, it is handled from Shalite's plant to Black Oak Ridge, a distance of 7.696 miles; from Black Oak Ridge back to Sevier Yard, 11.340 miles; from Sevier Yard to Southern Cast Stone, 9.48 miles, an empty from Southern Cast Stone to Sevier Yard, 9.48 miles, giving a total of 41.640 miles for the round trip of the car. Following the same procedure, the total distance in handling a car to and from Shalite to Knox Concrete Plant is about 46½ miles.

This movement is further explained by the General Superintendent of Transportation for the Southern, Mr. McNutt, where at R. 72 he answered as follows:

"A. The local enroute from John Sevier to Harriman and return serves this place. He will stop there and pull the loads, set out the empties, then that same train brings these cars on over to Black Oak siding, we call it, over here.

"Q. Why does that train take those cars over to Black Oak, Mr. McNutt? A. These cars all move back we'll say east from that point, and that is the only track, double ended track, that is practical to set those cars out in to be picked up on the return trip.

"Q. Is that the only double and side track you have between the Shalite Corporation and Black Oak, are there any double end tracks rather that you could use to set these cars off between Shalite and Black Oak? A. Not that would be practical. You have various tracks here at Coster and Coster Shops.

"Q. What is Coster Shop, Mr. McNutt? A. They do all the repairs, heavy repairs for open top equipment on the Southern Railway. These tracks are used in connection with the repair program at Coster.

"Q. Now, would it be possible to set these cars off on the 'Y' here west of the Shalite Corp. when the Middleboro branch connects with the line from Shalite? A. This train who works that place could set them off but you readily see he wouldn't have accomplished anything, when he set them off they would be in the same position as they would have if he had left them there.

"Q. Could he pick up the cars on the way back in, be any way to pick the cars up and bring them back into John Sevier? A. There wouldn't be a practical

way, you could shove them down there, go around the 'Y' and turn his engine and back his engine into Sevier.

"Q. Have to back his engine all the way back to John Sevier? A. Yes. He would have to turn his engine to pick them up on the 'Y'.

"Q. Now, tell us about the track here from John Sevier out to Black Oak. I believe you were in the hearing room when Mr. Gardner testified that this is a double track out to Shalite? A. This is a double track out to this point where you will we'll say turn to the right to go to Middleboro.

"Q. What kind of a track do you have there? A. Single track the rest of the way to Clinton and Harriman. Single track to Middleboro."

The witness was then asked why these shipments could not be handled by a switching crew rather than a local crew and it was explained that the work belonged, according to the union agreement to the regular train crew on the line-haul and could be changed only by agreement with the union.

The uncontradicted evidence, further, is that the $33 per car is arrived at by figuring at the rate of 66¢ per net ton on the basis of 50 tons per car. It also appears that the cost of ownership of these cars, not including the cost of operation, is $2.75 per day and on account of the necessary switching operation by reason of the geographical location of Shalite plant a round trip of the car from Shalite to either of these two intervenor plants consumes 7 to 8 days, so that the cost of ownership alone on each car in service for the Shalite plant to these two customers would be either $19.85 for 7 days, or $22 for 8 days,

either of which would be more than the $18.09 constituting the rate for those within the switching limits already.

This freight charge is paid by the purchasers of the Shalite material and naturally a lower freight rate would be of advantage to both them and the Shalite Corporation; but on this record it is very doubtful whether it can fairly be said that the product of the Shalite Corporation and the Williams Lime Company are competitive. Regardless of that point, however, it is certainly true that the circumstances and conditions surrounding the transportation from Shalite plant are not at all similar to other existing industries located in the switching limits and particularly that of Williams Lime plant, which is located within the switching limits on a so-called stub and switching track and, of course, the services are performed by a switching crew and switch engine at the Williams plant. The record shows that the Knox Concrete plant was put into the switching limits by order of the Public Service Commission, although all of the service is not performed by the switching crew.

The record further shows without contradiction that the manufacture of Shalite was commenced in 1950 and that from 1952 to 1956, which was the year before the hearing was had in this matter before the Commission, the volume of business of the Shalite Corporation had increased. The Shalite Corporation, therefore, has failed to show that the rate charged has actually operated or is now operating to its disadvantage in the marketing of its product. So far as the business of the intervenors is concerned, their proof is that most people buy on price instead of quality and hence they sell more of the cheaper blocks which are made from the Williams Lime Company limestone sand. It is pure speculation,

however, as to whether or not, if these two intervenors had the cheaper freight rate on Shalite, the sales of the still much higher priced Shalite blocks would be substantially increased.

In *Interstate Commerce Commission v. Baltimore & Ohio R. Co.*, 145 U.S. 263, 283, 284, 12 S.Ct. 844, 850, 36 L.Ed. 699, wherein unjust discrimination was charged because the Railway Company made a cheaper rate for a party of a minimum of ten persons than for one person, and Sections 2 and 3 of the Federal Interstate Commerce Act of February 4, 1887, which sections are the progenitors of the Tennessee sections, supra *Held*, "In short, the substance of all these decisions is that railway companies are only bound to give the same terms to all persons alike under the same conditions and circumstances, and any fact that produces an inequality of condition and a change of circumstances justifies an inequality of charge."

The Commission in its order stated that the rate being charged was "excessive". Whatever may have been intended by the use of that word, it was irrelevant to the determinative question stated in the beginning of this opinion. No attack was made upon the reasonableness of the rate being charged Shalite and both sides were in agreement in the briefs that that question was not involved. The whole question is whether or not the statute has been violated and from the foregoing rather detailed review of the evidence, we think it apparent that there is no material evidence to support the charge that said statutes were violated.

Wherefore the decree below is reversed and the petition of Shalite and intervenors is dismissed.