## LEHIGH VALLEY R. CO. v. PUBLIC SERVICE COMMISSION, SECOND DIST., OF STATE OF NEW YORK et al.

(District Court, N. D. New York. February 21, 1921.)

Nos. 288–295.

1. Commerce ⬤═85—Conditional authority to Interstate Commerce Commission to regulate intrastate rates within power of Congress over interstate and foreign commerce.

The authority given the Interstate Commerce Commission by Transportation Act Feb. 28, 1920, § 416 (3, 4), to prescribe a rate or fare on intrastate commerce to be observed by a carrier subject to its jurisdiction, if, after a full hearing, it shall find that a rate or fare imposed by state authority "causes any undue or unreasonable advantage, preference or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable or unjust discrimination against interstate or foreign commerce," which rate or fare so prescribed shall be observed, while in effect by the carriers affected thereby, "the law of any state or the decision or order of any state authority to the contrary notwithstanding," is within the constitutional power of Congress to regulate interstate and foreign commerce.

⬤═For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

2. **Commerce ⬤ 95—Findings of fact by Interstate Commerce Commission binding on courts.**

A finding by the Interstate Commerce Commission that a rate or fare imposed by state authority on intrastate commerce causes undue, unreasonable, and unjust discrimination against interstate and foreign commerce is binding on the courts, if there is any evidence to support it.

3. **Commerce ⬤ 7—Power of Congress to regulate interstate and foreign commerce includes incidental power over intrastate rates of carriers.**

While Congress has no constitutional power over intrastate rates as such, it has power to legislate respecting such rates for the protection of interstate or foreign commerce from a burden cast upon it by rates fixed by state authority, and its laws enacted in the exercise of such power are paramount.

In Equity. Separate suits by the Lehigh Valley Railroad Company, by the Lehigh & Hudson River Railroad Company, by the New York, Ontario & Western Railway Company, by the Erie Railroad Company, by the New Jersey & New York Railroad Company, by the Delaware, Lackawanna & Western Railroad Company, and by the Delaware & Hudson Company, railroad carriers, against the Public Service Commission, Second District, of the State of New York, and others. Suit by the State of New York and another against the United States and the members of the Interstate Commerce Commission. On motions by complainants in first-named suits for preliminary injunctions, and motion by defendants in the last-named suit to dismiss bill. Both motions granted.

Nos. 288–294, inclusive, are separate actions by the several carriers to enjoin the defendants from interfering with the carriers in their compliance with order of the Interstate Commerce Commission, which directed the carriers to increase intrastate passenger fares within the state of New York to the level of interstate passenger fares between the same points. See Ex parte 74, Increased Rates 1920, 58 Interst. Com. Com'n R. 220; 59 Interst. Com. Com'n R. 290. Hearing on motions of carriers for temporary injunctions. Motions granted, and decrees for preliminary injunctions ordered.

No. 295 is a suit under the Commerce Court Act (36 Stat. 539), and Urgent Deficiencies Act Oct. 22, 1913 (38 Stat. 219), to enjoin, set aside, annul, or suspend order of Interstate Commerce Commission, 59 Interst. Com. Com'n R. 290. Hearing on motion of plaintiffs for preliminary injunction, and on motions of defendants to dismiss. Motion for preliminary injunction denied. Motions to dismiss sustained, and suit dismissed on final decree.

These several actions, instituted by the railroad companies, are for an injunction seeking to restrain the Public Service Commission of the Second District of the state of New York, the Attorney General of the state of New York, and counsel for the Public Service Commission for the Second District, from commencing any suit or proceeding to enforce the provisions of the laws of the state of New York (chapters 48, 49, of the Consolidated Laws of 1910; section 57 of the Railroad Law; sections 24, 56, 57, of the Public Service Commission Law) against said plaintiffs by reason of anything done or omitted to be done by the plaintiffs under the authority of an order of the Interstate Commerce Commission, or doing any act which would prevent or tend to prevent the plaintiffs or their agents from charging or collecting the intrastate rates, fares, and charges established by the Interstate Commerce Commission in the state of New York. They seek an injunction pending the hearing and determination of the plaintiffs' application for an interlocutory injunction.

---

⬤ For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

The state of New York and the Attorney General of the state seek an injunction restraining the Interstate Commerce Commission from enforcing an order made fixing said rates and charges, and seek to have it determined that the order of the Interstate Commerce Commission is wholly null and void and unconstitutional and illegal, and ask for "writs of mandamus, certiorari, and prohibition as warranted by the principles and usages of law." They seek to restrain the defendants and their agents from bringing any suit, action, or prosecution against the railroads to compel the enforcement, operation, and execution of the findings and orders of the Interstate Commerce Commission referred to, and finally they seek injunctive relief. Each of these applications opposed.

In Cases Nos. 288–294, inclusive:

Walter C. Noyes and George F. Brownell, both of New York City (H. D. Noble, Jr., of Auburn, N. Y., and R. W. Barrett, of New York City, for Lehigh Valley R. Co.; H. D. Noble, Jr., of Auburn, N. Y., and John J. Beattie, of Warwick, N. Y., for Lehigh & H. R. R. Co.; C. L. Andrus, of New York City, for New York, O. & W. R. Co.; George F. Brownell and D. E. Minard, both of New York City, for Erie R. Co. and New Jersey & N. Y. R. Co.; W. S. Jenney and John L. Seager, both of New York City, for Delaware, L. & W. R. Co.; Walter C. Noyes and William D. Waldron, both of New York City, for Delaware & H. Co.—on the brief), for plaintiff carriers.

Ledyard P. Hale, of Albany, N. Y., for defendants Hill and others, as the Public Service Commission.

In Case No. 295:

Edward G. Griffin and George L. Meade, Deputy Attys. Gen., of New York (Charles D. Newton, Atty. Gen., of New York, on the brief), for plaintiffs.

Blackburn Esterline, Sp. Asst. Atty. Gen., of Washington, D. C., for the United States.

P. J. Farrell, of Washington, D. C., for defendants Clark and others, as the Interstate Commerce Commission.

Walter C. Noyes and George F. Brownell, both of New York City, for intervening carriers.

Before MANTON, Circuit Judge, and RAY and HAZEL, District Judges.

MANTON, Circuit Judge (after stating the facts as above). [1] The question presented in these cases is whether Transportation Act 1920 (41 Stat. 456) § 416, amending Interstate Commerce Act, § 13 (Comp. St. § 8581), in so far as it permits the Interstate Commerce Commission to fix the rates and fares for the intrastate traffic on interstate railroads in the state of New York, is constitutional. The act provides:

"Sec. 13 (3). Whenever in any investigation under the provisions of this act, or in any investigation instituted upon petition of the carrier concerned, which petition is hereby authorized to be filed, there shall be brought in issue any rate, fare, charge, classification, regulation, or practice, made or imposed by authority of any state, or initiated by the President during the period of federal control, the Commission, before proceeding to hear and dispose of such issue, shall cause the state or states interested to be notified of the proceed-

ing. The Commission may confer with the authorities of any state having regulatory jurisdiction over the class of persons and corporations subject to this act with respect to the relationship between rate structures and practices of carriers subject to the jurisdiction of such state bodies and of the Commission; and to that end is authorized and empowered, under rules to be prescribed by it, and which may be modified from time to time, to hold joint hearings with any such state regulating bodies on any matters wherein the Commission is empowered to act and where the rate-making authority of a state is or may be affected by the action taken by the Commission. The Commission is also authorized to avail itself of the co-operation, services, records, and facilities of such state authorities in the enforcement of any provision of this act.

"(4) Whenever in any such investigation the Commission, after full hearing, finds that any such rate, fare, charge, classification, regulation, or practice causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce, which is hereby forbidden and declared to be unlawful, it shall prescribe the rate, fare, or charge, or the maximum or minimum, or maximum and minimum, thereafter to be charged, and the classification, regulation, or practice thereafter to be observed, in such manner as, in its judgment, will remove such advantage, preference, prejudice, or discrimination. Such rates, fares, charges, classifications, regulations, and practices shall be observed while in effect by the carriers parties to such proceeding affected thereby, the law of any state or the decision or order of any state authority to the contrary notwithstanding."

The Interstate Commerce Commission, pursuant to the provisions of this act, was requested in a proper proceeding to make findings as to an increase in freight rates and baggage fares and baggage charges, and rates for milk and cream within the region which includes the state of New York. It made findings for this region allowing an increase of 40 per cent. in the interstate freight rates, 20 per cent. in interstate passenger fares, baggage charges, and rates on milk and cream, and also a surcharge amounting to 50 per cent. of the charge for space in the sleeping and parlor cars to accrue to the rail carriers. Ex parte 74, Increased Rates 1920, 58 Interst. Com. Com'n R. 220. Thereafter the steam railroads within the state of New York made, pursuant to section 13, an application to the Public Service Commission of the State of New York, Second District, for permission to file, effective on five days' notice, tariff supplements providing increase in rates, fares and charges applicable to the intrastate tariff in the state of New York, corresponding with those authorized by the Interstate Commerce Commission. The Public Service Commission allowed the same so far as the rates and charges for transportation of freight, except milk (order of August 19, 1920), and the increase became effective August 26, 1920, contemporaneously with the increase in the interstate rates. However, so far as it related to passenger fares, sleeping car and parlor car fares, baggage charges and rates on milk and cream, the application was denied by the Public Service Commission.

A petition for relief was thereafter filed by the steam railroads under the provisions of section 13 of the Interstate Commerce Act with the Interstate Commerce Commission. Upon the hearing of this petition, the Interstate Commerce Commission found that the refusal

of the state of New York, through the Public Service Commission, to permit the carriers to increase the rates and fares here in controversy to the extent approved by the Interstate Commerce Commission, is costing the railroads between $11,000,000 and $12,000,000 annually, so that the annual earnings of the interstate carriers operating in New York are now between $11,000,000 and $12,000,000 less than they would be if the general lawful rates and freights approved by the Interstate Commerce Commission had become effective on intrastate traffic. Specifically, they find, as to passenger fares, they are of an unduly preferential character, and, so far as the intrastate fares and charges now in effect in the state of New York are concerned, interstate passenger fares are, in general, upon a basis of 3.6 cents per mile per maximum. Passengers traveling between points in the state of New York and other states may be required to pay 3.6 cents per mile, whereas passengers traveling within the state of New York pay only 3 cents per mile. The basis of 3.6 cents applies on intrastate traffic in every state bordering on the state of New York, and intrastate passengers in New York enjoy a basis of fare distinctly lower than those exacted from interstate passengers in the same territory, often riding in the same trains, and also lower than fares paid by intrastate passengers in neighboring states.

It is found that there are no transportation conditions in the state of New York that justify lower rates or fares on the whole than those applicable in neighboring states, or lower than the interstate rates and fares between points in New York and points in other states. As illustrative of this, the Commission cites the case of the several available routes connecting New York City and Buffalo over the New York Central, while the others are interstate. It is pointed out that on August 26, 1920, the fare was $14.26 over the interstate routes and $13.60 over the New York Central, a difference of $1.11 in favor of the passenger using the latter route; and in case the passenger occupies the lower Pullman berth, the difference is $2.36. A passenger, traveling from New York City to a point west of Buffalo, can, by buying a ticket to Buffalo over the New York Central, and buying another ticket at Buffalo to destination, defeat the through interstate fare. This practice is found to be carried on to considerable extent, with a tendency to disrupt the entire fabric of interstate passenger fares in the territory involved. Excess baggage charges are governed by the passenger fares, and a discrimination in passenger fares necessarily involves a discrimination in excess baggage charges.

Likewise, in the rates fixed for milk and cream—which includes skim milk, buttermilk, condensed milk, evaporated milk, and pot cheese —it is shown to be discriminatory. It is pointed out that the New York Central Railroad operates nine milk trains daily to New York City district, carrying 1,300,000 quarts of milk and cream, of which approximately 75 per cent. is shipped over intrastate routes and approximately 25 per cent. over interstate routes. Nine or ten carloads of milk and cream per day originate on the Ulster & Delaware Railroad, which extends from Kingston, N. Y., northwest to Oneonta, 107 miles. The cars are delivered to the New York Central at Kingston,

together with six or seven cars originating on a branch of the latter carrier, extending southwesterly from Kingston, and are then formed into a milk train which moves to New York over the tracks of the West Shore line. The route over the West Shore line extends into the state of New Jersey, the West Shore terminals being at Weehawken, and is therefore an interstate route. Shipments of milk and cream also originate at points on the east side of the Hudson and in territory not far distant from that served by the Ulster & Delaware, and move to New York over the intrastate route of the New York Central along the east bank of the Hudson river. On shipments using the interstate route, the rate charges are 20 per cent. higher than those over the intrastate, although there is no justification, from a transportation point, for a difference in the rates.

Further, it is pointed out that a milk train is operated by the Delaware & Hudson Company from Eagle Bridge, N. Y., which is northwest of Troy, in a northerly direction, a distance of 52 miles, to Castleton, Vt., thence southwesterly to Troy, N. Y., where it is delivered to the New York Central. Between Eagle Bridge and Castleton this train crosses the state line three times, and again shortly after leaving Castleton for Troy. All shipments received before the last crossing of the state line are interstate shipments, and others intrastate shipments. On milk and cream in this train, which crosses the state line, charges must be made at interstate rates, which are in excess of the charges for intrastate rates. The shipment of milk and cream on the western Vermont border are, when shipped to the New York City district, in competition with the milk and cream shipped from eastern New York state, which would have an intrastate route of carriage.

The Interstate Commerce Commission has found that interstate rates on this traffic were unreasonable and unduly prejudicial to shippers from near-by points and unduly preferential to shippers from distant points, and resulted in a scale of mileage rates in blocks of 10 miles each from distances away from the New York district up to 630 miles. Thus uniformity was procured. Milk and Cream Rates to New York City, 45 Interst. Com. Com'n R. 412. With this present difference of 20 per cent. increase above intrastate rates, such uniformity of charge would no longer exist.

The question of commutation fares was presented to the Commission, but that was reserved for future consideration.

[2] The foregoing findings of the Interstate Commerce Commission are binding upon us, if the findings have any evidence to support them. An examination of the testimony taken by the Commission upon the hearing of the petition for relief satisfies us that there is evidence to support the claims advanced by the railroads.

It was said in the Supreme Court, in Interstate Commerce Commission v. A., T. & Santa Fé R. Co., 234 U. S. 294, 34 Sup. Ct. 814, 58 L. Ed. 1319, where the Supreme Court had under consideration the question of restraint of the Interstate Commerce Commission in executing an order which required carriers to desist from exacting a charge for delivering and receiving a carload of freight to and from industries located upon spur tracks and side tracks within their re-

spective switching limits in Los Angeles when moving in interstate commerce: .

"But, laying the generalization on one side, it is plain that the question whether or not there is at any point an additional service in connecton with industrial spur tracks upon which to base an extra charge, or whether there is merely a substituted service which is substantially a like service to that included in the line-haul rate and not received, is a question of fact to be determined according to the actual conditions of operation. Such a question is manifestly one upon which it is the province of the Commission to pass.

"4. We must therefore take the findings of the Commission in the present case as to the character and manner of use of the industrial spurs in Los Angeles—that they constituted part of the carrier's terminals and that under the conditions there existing, the receipt and delivery of goods on these spurs was a like service as compared with the receipt and delivery of goods at team tracks and freight sheds—as conclusions of fact. Assuming that they were based upon evidence, they are not open to review [citing cases]."

And in Skinner & Eddy Corp. v. United States, 249 U. S. 557, at page 562, 39 Sup. Ct. 375, at page 377 (63 L. Ed. 772), it was said:

"First. The defendants contend that the District Court did not have jurisdiction of the subject-matter of this suit, because orders entered in a fourth section proceeding cannot be assailed in the courts, at least, not until after a remedy has been sought under sections 13 and 15 of the Act to Regulate Commerce. This contention proceeds apparently upon a misapprehension of plaintiff's position. If plaintiff had sought relief against a rate or practice alleged to be unjust because unreasonably high or discriminatory, the remedy must have been sought primarily by proceedings before the Commission [citing cases]; and the finding thereon would have been conclusive, unless there was lack of substantial evidence, some irregularity in the proceedings, or some error in the application of rules of law [citing cases]. But plaintiff does not contend that 75 cents is an unreasonably high rate or that it is discriminatory or that there was mere error in the action of the Commission. The contention is that the Commission has exceeded its statutory powers, and that hence the order is void. In such a case the courts have jurisdiction of suits to enjoin the enforcement of an order, even if the plaintiff has not attempted to secure redress in a proceeding before the Commission."

And in Seaboard Air Line Ry. v. United States, 254 U. S. 57, at page 62, 41 Sup. Ct. 24, at page 25 (65 L. Ed. ——), the Supreme Court said:

"We are of opinion that the Commission was correct in regarding the service in question as a like and contemporary service rendered under substantially similar circumstances and conditions, and amply sustained as matter of law in Wight v. United States, 167 U. S. 512, 17 Sup. Ct. 822, 42 L. Ed. 258, and Interstate Commerce Commission v. Alabama Midland R. Co., 168 U. S. 144, 18 Sup. Ct. 45, 42 L. Ed. 414. The principle established in these cases is that the statute aims to establish equality of rights among shippers for carriage under substantially similar circumstances and conditions, and that the exigencies of competition do not justify discrimination against shippers for substantially like services. Moreover, the determination of questions of fact is by law imposed upon the Commission, a body created by statute for the consideration of this and like matters. The findings of fact by the Commission upon such questions can be disturbed by judicial decree only in cases where their action is arbitrary or transcends the legitimate bounds of their authority [citing cases]."

After the findings were made by the Interstate Commerce Commission and the orders issued, it was binding upon the railroad companies, and each was obligated to charge and collect the rates there fixed.

Pursuant to section 13, if, after hearing, the Commission should find that such intrastate rate or fare "causes any undue or unreasonable advantage, preference, or prejudice as between persons or localities in intrastate commerce on the one hand and interstate or foreign commerce on the other hand, or any undue, unreasonable, or unjust discrimination against interstate or foreign commerce," it shall then be the duty of the Commission to prescribe a rate or charge upon such intrastate commerce in order to remove such advantage, preference, prejudice, or discrimination. Further than this, the rate having been fixed by reason of the terms of section 13, such rates, fares, and charges must be observed by the carriers affected thereby, the law of any state or the decision or order of any state to the contrary notwithstanding.

The railroad complainants have alleged by their complaints and affidavits that, notwithstanding the order of the Interstate Commerce Commission made after such findings, the state authorities are attempting to prevent the complainants from complying therewith, and are threatening prosecution because of compliance therewith by the complainants, and that thus irreparable damage will be done to them, if the state authorities are not restrained.

[3] If Congress had the power to legislate granting the authority to fix such intrastate rates so as to prevent undue or unreasonable advantage, prejudice, or preference between persons and localities in intrastate commerce and interstate or foreign commerce on the other hand, thus avoiding undue and unjust discrimination, the facts found by the Commission warrant its order. That Congress had power to so legislate has been substantially decided by the Supreme Court. In the Minnesota Rate Case, 230 U. S. 352, 33 Sup. Ct. 729, 57 L. Ed. 1511, 48 L. R. A. (N. S.) 1151, Ann. Cas. 1916A, 18, the court said:

"This reservation to the states manifestly is only of that authority which is consistent with and not opposed to the grant to Congress. There is no room in our scheme of government for the assertion of state power in hostility to the authorized exercise of federal power. The authority of Congress extends to every part of interstate commerce, and to every instrumentality or agency by which it is carried on; and the full control by Congress of the subjects committed to its regulation is not to be denied or thwarted by the commingling of interstate and intrastate operations. This is not to say that the nation may deal with the internal concerns of the state, as such, but that the execution by Congress of its constitutional power to regulate interstate commerce is not limited by the fact that intrastate transactions may have become so interwoven therewith that the effective government of the former incidentally controls the latter. This conclusion necessarily results from the supremacy of the national power within its appointed sphere [citing cases].

The grant in the Constitution of its own force, that is, without action by Congress, established the essential immunity of interstate commercial intercourse from the direct control of the states with respect to those subjects embraced within the grant which are of such a nature as to demand that, if regulated at all, their regulation should be prescribed by a single authority. It has repeatedly been declared by this court that as to those subjects which require a general system or uniformity of regulation the power of Congress is exclusive. In other matters, admitting of diversity of treatment according to the special requirements of local conditions, the states may act within their respective jurisdictions until Congress sees fit to act, and, when Congress does act, the exercise of its authority overrides all conflicting state legislation."

No local rule can nullify the lawful éxercise of federal authority, and, after the Interstate Commerce Commission has made an order within its jurisdiction, there is no compulsion on the carrier to comply with any inconsistent local requirements. Houston E. & W. Texas Ry. Co. v. United States, 234 U. S. 342, 34 Sup. Ct. 833, 58 L. Ed. 1341. Where state and federal views conflict, the judgment of Congress and the agencies of the government lawfully established by the laws of Congress must control. Otherwise "the nation could not prosper if interstate and foreign trade were governed by many masters." Houston E. & W. Texas Ry. Co. v. United States, supra. In the Houston Case, where an order of the Interstate Commerce Commission was made to correct discrimination found to exist against specified localities, interstate carriers were ordered to desist from charging higher rates for transportation between certain specified interstate points than between certain specified intrastate points. It was held to be within the power delegated by the Congress to the Commission that, so far as the carrier's interstate rates conform to what was found to be reasonable by the Commission, they were entitled to maintain them, and that they were free to comply with the order by so adjusting their intrastate rates, to which the order related, so as to remove the forbidden discrimination.

It is urged by the state of New York that if the interstate commerce order be permitted to prevail so far as it affects intrastate rates, the same would violate the Tenth Amendment of the United States Constitution, in that it would invade powers reserved to the states to regulate intrastate commerce and to create, on proper conditions, control, and regulate corporations doing business in the state of New York; and it is further contended that article 1, section 8, clause 3, of the Constitution is violated by permitting the order fixing the rates to stand because it assumes to regulate purely intrastate commerce and requires that the revenue for interstate commerce be collected from intrastate commerce. These contentions are all disposed of by the language of the Supreme Court in Gulf, Colorado & S. F. R. v. Hefley, 158 U. S. 98, 15 Sup. Ct. 802, 39 L. Ed. 910, where Justice Brewer, writing the opinion, announced:

"Clearly the state and the national acts relate to the same subject-matter and prescribe different rules. By the state act the bill of lading is made controlling as to the rate collectible, and a failure to comply with that requirement exposes the delinquent carrier to its penalties, while the national statute ignores the bill of lading and makes the published tariff rate binding, and subjects the offender, both carrier and agent, to severe penalties. The carrier can not obey one statute without sometimes exposing itself to the penalties prescribed by the other. Take the case before us: If, in disregard of the joint tariff established by the defendant and the St. Louis & San Francisco Railway Company and filed with the Interstate Commerce Commission, the latter company, as a matter of favoritism, had issued this bill of lading at a rate less than the tariff rate, both the defendant company and its agent would, by delivering the goods upon the receipt of only such reduced rate, subject themselves to the penalties of the national law, while, on the other hand, if the tariff rate was insisted upon, then the corporation would become liable for the damages named in the state act. In case of such a conflict the state law must yield. 'This Constitution, and the laws of the United States which shall be made in pursuance thereof * * * shall be

the supreme law of the land.' Constitution, art. 6, cl. 2. * * * Generally it may be said in respect to laws of this character that, though resting upon the police power of the state, they must yield whenever Congress, in the exercise of the powers granted to it, legislates upon the precise subject-matter, for that power, like all other reserved powers of the states, is subordinate to those in terms conferred by the Constitution upon the nation. 'No urgency for its use can authorize a state to exercise it in regard to a subject-matter which has been confided exclusively to the discretion of Congress by the Constitution.' Henderson v. New York, 92 U. S. 259, 271. 'Definitions of the police power must, however, be taken, subject to the condition that the state cannot, in its exercise, for any purpose whatever, encroach upon the powers of the general government or rights granted or secured by the supreme law of the land.' New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650, 661. 'While it may be a police power in the sense that all provisions for the health, comfort, and security of the citizens are police regulations, and an exercise of the police power, it has been said more than once in this court that, where such powers are so exercised as to come within the domain of federal authority as defined by the Constitution, the latter must prevail.' Morgan v. Louisiana, 118 U. S. 455, 464."

The facts found by the Commission and upon which it based its order, well illustrate the need for regulation of the intrastate rates by the Interstate Commerce Commission. Under the transportation act, it was thought to enable the carriers to earn an aggregate annual net railway operating income, equal, as nearly as may be, to 6 per cent. upon the aggregate value of the railway property of such carriers held for and used in the service of transportation. To accomplish this, the Commission is required to modify, establish, or adjust rates for the carriers as a whole or as a whole in each of such rate groups or territories as the Commission shall from time to time designate. The carriers here are included in the Eastern. To permit the New York state law to prevail and the orders of the Public Service Commission of the state of New York to be enforced would create an unjust discrimination of rates between the intrastate rate for New York and the interstate rate which, in turn, would cast a burden upon the interstate commerce of the railroads within this group, resulting in such a rise for maintenance of prices of rates and fares within the Eastern group, so as to make up the deficiency caused by the lower intrastate rates and fares, which the Commission finds is between $11,000,000 and $12,000,000 per year.

This power was granted by the Congress to the Interstate Commerce Commission as a means of protection against commercial hostilities and reprisals between the various states. Therefore, the protection of the Interstate Commerce Commission was imperative for the railroads. More so than ever, since the federal control of railroads, the country has learned the lesson of the importance of linking the arms of transportation and commerce over the country. It has resulted in the states becoming dependent upon each other to obtain favorable transportation conditions. Uniformity of rates to make for the proper transportation facilities were essential to the success of the purposes sought to be affected by the terms of the Transportation Act. We recognize that Congress has no constitutional power to touch intrastate rates as such, and the Transportation Act of 1920 is intended only to protect interstate commerce. It is because the rate fixed by

the Railroad Law and the Public Service Commission of New York casts a direct burden upon the interstate commerce and is jeopardizing the power of the national carriers to maintain themselves on the basis which Congress declared they should be maintained under the Transportation Act of 1920, that this court grants relief.

Ample reason exists here why this court has jurisdiction and should prevent irreparable injury occurring to the railroads. Under section 59 of the Railroad Law of the state of New York the complainants could be fined for charging more than that fixed by the Public Service Commission as a permissible fare or rate, and section 49 of the Public Service Commission Law empowers the Public Service Commission of the Second District to fix the rate which the railroads are obliged to observe. For failing to carry out the orders of the Public Service Commission when fixed, as to rate or fare, each offense constitutes a separate violation, for which there is a penalty of $5,000, and the offending railway may be convicted of a misdemeanor, for which there is the penalty of imprisonment to the offending officer and a fine of $500. From all of this it is obvious that there is danger, not only of injury and loss to the property of the railway companies because of their being subjected to the fines and penalties, but there is the threatened danger of multiplicity of suits.

The motion for injunctive relief of the several railroad company complainants will be granted, and the motion for injunctive relief of the Attorney General and the state of New York will be denied. The motion of the United States and the Interstate Commerce Commission to dismiss the bill for want of equity will be granted.

Orders may be presented accordingly; also final decree in the action instituted by the state of New York.