### GULF, M. & N. R. CO. v. ILLINOIS CENT. R. CO.

No. 88.

District Court, W. D. Tennessee, E. D.
Nov. 10, 1937.

J. N. Flowers, of Jackson, Miss., Walter P. Armstrong and Benj. Goodman, Jr., both of Memphis, Tenn., for plaintiff.

Chas. N. Burch and H. D. Minor, both of Memphis, Tenn., and Chas. A. Helsell, of Chicago, Ill. (E. C. Craig, of Chicago, Ill., of counsel), for defendant.

MARTIN, District Judge.

The motion of the plaintiff railroad company for a preliminary injunction seeks to restrain the defendant railroad company from an alleged violation of an order of the Interstate Commerce Commission (Finance Docket No. 9916, 193 I.C.C. 106), and to restrain the defendant from interference with the operation by plaintiff of its through freight trains, drawn by its own locomotives and in charge of its own crews between Bemis, Tenn., and Paducah, Ky., over the tracks of the defendant, pursuant to the provisions of a trackage contract between the parties of date June 7, 1933.

A decree for specific performance of this trackage contract is prayed by the plaintiff, especially as pertains to the provision therein for the continued operation by the plaintiff of its through freight trains, drawn by its own locomotives and in charge of crews selected by plaintiff from its own employees.

A certificate of public convenience and necessity, effective June 7, 1933, was issued by the Interstate Commerce Commission, authorizing the operation by plaintiff under trackage rights over the railroad of defendant in listed counties and places in Tennessee and Kentucky, and permitting the abandonment by the plaintiff of operation under trackage rights over the railroad of the Nashville, Chattanooga & St. Louis Railway, in the same territory.

In its answer, the defendant admits full performance by the plaintiff of its contract of June 7, 1933; and that, notwithstanding such compliance, it notified the plaintiff that on April 30, 1936, it would require the plaintiff to use employees of defendant in making up the crews for the operation of plaintiff's trains over defendant's tracks between Bemis and Paducah, and that it would deny plaintiff the use of defendant's lines unless the trains of plaintiff run over the designated route were manned by employees of the defendant railroad company.

The reasons given by the defendant for its action are that nearly all of its employees who operate freight trains are members of the affiliated Big Four Railroad Brotherhoods, namely the Brotherhood of Locomotive Engineers, the Brotherhood of Locomotive Firemen and Enginemen, the Order of Railway Conductors, and the Brotherhood of Railroad Trainmen, which

have definitely decided through their respective officials, acting concertedly, that Illinois Central employees should be permitted to man all trains on the Illinois Central Railroad tracks between Jackson, Tenn., and Paducah, Ky., including the freight trains of plaintiff; that, unless the defendant yields to the demand of the Big Four Railroad Brotherhoods, the engineers, firemen, conductors, brakemen, and flagmen on its whole system of nearly 7,000 miles of railroad will refuse to work further for defendant; that it will be unable to supply their places, and that its operations "would thereby be brought to a standstill not only to the irreparable injury of defendant, but to the irreparable injury of the public, and also of the plaintiff."

To this averment, the defendant adds: "On the other hand, if defendant's employees are placed on said trains of plaintiff, transportation and traffic will be conducted as heretofore, as the train operatives of plaintiff are members of said four organizations and are bound by the decision of their Grand Lodges and Grand Officers, and will obey said decision."

Supporting affidavits of various officials of the railroad brotherhoods substantiate the precarious position of the defendant railroad company, should it fail to accede to their demands. These affidavits show that, should the Illinois Central Railroad Company permit the employees of the Gulf, Mobile & Northern Railroad Company to operate trains over the former's tracks, a strike vote will be taken among the membership of the railroad brotherhoods; with the opinion expressed by affiants that the vote of the employees would result in favor of a strike.

These affidavits show, further, that the manning of the Gulf, Mobile & Northern Railroad Company freight trains by Illinois Central Railroad Company regular employees is a very vital matter to the four railroad brotherhoods, involving seniority rights of Illinois Central employees for which the brotherhoods had contended long prior to the contract of June 7, 1933; and that "by long understanding, the said Illinois Central employees were entitled to man all trains operating over Illinois Central tracks," which right the Illinois Central Railroad Company refused to recognize, with the result that the chief executives of the brotherhoods, after investigation, decided jointly that Illinois Central employees should be permitted to

man all trains on the Illinois Central tracks between Jackson, Tenn., and Paducah, Ky., "regardless of where they come from or which railroad's equipment is used."

The position of the Big Four Railroad Brotherhoods is well stated in the affidavit of T. S. Jackson, chairman of the general grievance committee of the Brotherhood of Railroad Trainmen on the Illinois Central Railroad System. After stating the facts upon which this controversy arises, the affiant says:

"Reference of the controversy to said employe members for their consideration and action means taking of a referendum vote to determine whether or not said General Committee and executive officers of the organizations should be authorized to direct a peaceful withdrawal of such employe members from the service of said Illinois Central System in the event a satisfactory settlement could not be effected; that affiant is reasonably certain that such a referendum vote would be in favor of such a withdrawal from the service, that is a strike, unless a satisfactory settlement could be effected; that a strike would mean that all engineers, firemen, conductors, brakemen, flagmen and switchmen on said Illinois Central System would cease and discontinue to work until the request of said brotherhoods was complied with; that such a referendum or strike vote would be binding also on the Gulf, Mobile & Northern employes who manned Gulf, Mobile & Northern trains between Bemis and Paducah, and that said Gulf, Mobile & Northern employes, in the event of a strike, would likewise cease and discontinue to work and that no trains, either Illinois Central or Gulf, Mobile & Northern, would be moved between Bemis, Tennessee, and Paducah, Kentucky, and that no trains would move anywhere on the Illinois Central System; that in the event of a strike no competent men could be found who would be willing to undertake the work of moving said trains; that the business of transportation and traffic on the Illinois Central System, in the event of a strike, would be brought to a standstill; that the convening of the General Committees and the further steps just indicated were delayed when it was ascertained by said four organizations that the President of the Illinois Central System had given notice to the President of the Gulf, Mobile & Northern Railroad that after April 30, 1936, Gulf, Mobile & Northern trains would not be allowed to move from Bemis to Paducah and in the reverse direction unless manned by Illinois Central employees; that in the event of calling a strike said four organizations would not permit any injury to persons or damage to property, but that said strike would be carried on in a lawful way and in accordance with the laws of the United States and the several states; that said organizations sincerely believe that their complaint is just and in accordance with the terms of their schedules or wage and working agreements with the Illinois Central System of many years' standing, and that their request for manning Gulf, Mobile & Northern trains with Illinois Central employes between Bemis and Paducah should be complied with; that they are advised that they have a lawful right to strike and to cease and discontinue work and that they are protected in this step by the statutes of the United States and that a strike is a lawful weapon.

"Affiant avers that in view of the pending suit which has been brought by the Gulf, Mobile & Northern Railroad Company against the Illinois Central Railroad Company in this court, the said four brotherhoods have deferred taking any further action pending the determination of this cause; that said four organizations are fighting for a principle and their contractual rights, that is, where one railroad company grants trackage rights to another railroad company, then the employes of the granting company are entitled to all work in the movement of trains over the rails of the granting company; that the establishment of such principle is of the highest importance and vital to the protection of men morking for railroad companies; that otherwise practically all of the work of transportation on the line of any railroad may be taken away from the regular employes of said railroad regardless of their prior contractual rights and given to the employes of another railroad or railroads which obtain trackage rights; that the employes of the Gulf, Mobile & Northern Railroad, as well as the employes of the Illinois Central Railroad, will obey and abide by the decision of said four brotherhoods and that said four brotherhoods are not to be understood as making threats in order, even if they could, to coerce judgment of this honorable court.

"This affidavit is made for use in connection with the suit filed by the Gulf, Mobile & Northern Company vs Illinois Central Railroad Company, being case No. 88 in Equity in the District Court of the

United States for the Western District of Tennessee, Eastern Division."

The plaintiff railroad company has submitted affidavits of its president, executive vice-president, and general manager. Briefly summarized, these affidavits present the following pertinent facts:

In order to get a longer haul on traffic which it originated and controlled, the plaintiff railroad, in 1926, undertook to extend its operations to the Ohio river. To accomplish this, it contracted with the Nashville, Chattanooga & St. Louis Railroad Company for the joint use of the latter's tracks from Jackson, Tenn., to Paducah, Ky. Exchange of traffic arrangements were consummated by the plaintiff railroad, and large investments were made by it to effectuate its plans of expansion, in dependence upon the trackage contract entered into with the Nashville, Chattanooga & St. Louis Railroad Company, under which the plaintiff's trains were operated over the lines of the Nashville, Chattanooga & St. Louis Railroad Company between Jackson, Tenn., and Paducah, Ky.; it being provided in the trackage contract that such trains should be operated by the plaintiff railroad company as its own trains, which should be made up of its own locomotives and cars, and operated by its own employees. All of its plans of expansion and operation were approved by the Interstate Commerce Commission and were effective up to the time the plaintiff entered into the contract of June 7, 1933, with the defendant, Illinois Central Railroad Company.

Affiants state that the provisions contained in the contract, for the operation of its trains, made up of its own cars and drawn by its own locomotives and manned by its own employees, was regarded not only as material, but as essential. In fact, it is stated that the plaintiff would not have surrendered its contract with the Nashville, Chattanooga & St. Louis Railroad Company, had not the right to operate its trains with its own regular employees been preserved in its new contract with the Illinois Central. The affidavits contain fact argument to the point that the trains of plaintiff over the route in question would not be as efficiently operated by employees selected from the list of the defendant railroad company as would be the case in the event such trains were operated by the plaintiff railroad's own crews.

The executive vice-president of plaintiff railroad urges that "they (Illinois Central employees) cannot serve two employers and be loyal to both in instances where their employers are competitors in business."

The president of the plaintiff railroad, in his affidavit, states: "The right to handle our trains, in our own way and with our own men, is an essential and valuable right. To us it is as material and vital provision or term of the contract as that fixing the compensation to be paid for the use of the tracks. As a practical matter, we could not as successfully operate our trains with persons who are not our regular employees as we can with our own men."

In this view, the president is supported by the general manager of the railroad, who says: "It is not true that we could operate our trains over the Illinois Central tracks between Bemis, Tennessee, and Paducah, Kentucky, with Illinois Central employees as successfully and efficiently as we can with our own regular employees. I make this statement and the above denial from my personal knowledge, gained through long experience in direct dealings with train men and in actually participating in the handling of the movement of trains * * * The mere mechanical efficiency of a man is not enough, nor is his willingness to perform the letter of his contract. The additional equipment needed is an unconditional and vital interest in making a record for himself and in promoting the success of the employer for whom he is performing the service of moving the trains. There are many things the man can omit or refuse to do and still be within the terms of his employment. It is the difference between the employee who is working for promotion and therefore trying to please the employer and promote the employer's interest and the man who has a contract that calls for so much pay for so much work and is interested only in doing enough to take down his money at pay day * * * From my daily observation and experience I am able to say that our own men are active and alert in protecting and promoting the interest of our company in the handling of contingencies that arise out on the road in the movement of trains, day and night, to a degree and to an extent that we could not and would not expect from employees of the Illinois Central Railroad Company in charge of our trains, however experienced and efficient such other men might be."

The general superintendent of the defendant, Illinois Central Railroad Com-

pany, by affidavit gainsays the fact conclusions of the officials of the plaintiff railroad company. He states under oath that:

"The Illinois Central Railroad Company has in its employ a sufficient number of skilled train operatives to operate successfully and efficiently said G. M. & N. trains and that said trains could be manned and moved by men taken from the Illinois Central seniority rosters just as well or better than they could be operated, or are now operated by G. M. & N. operatives. Affiant further states that during the time men taken from Illinois Central seniority rosters were handling G. M. & N. trains, they would be G. M. & N. employees.

"Affiant further states that a strike on the Illinois Central would have a serious and disastrous effect on the Illinois Central Railroad Company and, particularly, on shippers who ship goods via the Illinois Central, and the mere taking of a strike vote would induce many shippers to refuse to ship on a line on which a strike is threatened. Affiant further states that men taken from the Illinois Central seniority list would in every instance be men who are familiar with the route between Bemis and Paducah and who are accustomed to operate over said road, whereas G. M. & N. men, in the event of an emergency, would likely be men who had seldom operated over that portion of the Illinois Central System.

"Affiant further states that so far as waybills covering G. M. & N. cars moving between Bemis and Paducah and in the reverse direction are concerned, if the offer of the Illinois Central Railroad Company made in its answer filed herein, to place such waybills in sealed containers so as not to be accessible to the crews taken from the Illinois Central seniority roster, is carried out and the keys to said container are placed in the possession of the G. M. & N. employees alone, then the crews taken from the Illinois Central seniority roster would have no opportunity to know and could not obtain any information contained in said waybills or other documents as to the cars moved in said trains; that this arrangement would be a practical, convenient and satisfactory method of conducting said business which would meet the objection of plaintiff in this respect and would secure to the G. M. & N. complete secrecy as to its business involved."

The affidavit of the manager of personnel of the defendant railroad company, after corroborating the affidavits of the brotherhood officials as to the negotiations leading to the final position taken by the railroad brotherhoods, states that it is his belief and conviction that if the defendant company "does not continue to accede to the demands of the Brotherhoods that they will in fact carry out their threat to exercise their economic pressure, that is to say, they will take a strike vote and that it is the opinion of their General Chairman that the vote would be in favor of a strike."

The affidavit states further that "in the event the threatened strike actually takes place, defendant's solvency will be greatly jeopardized, if not actually impaired"; and concludes: "Affiant further states that the controversy is not one primarily between the two railroad companies, but is a labor dispute within the provisions of the Railroad Labor Act [45 U.S.C.A. § 151 et seq.] * * * That said labor dispute is one in which the interests of the employees themselves are of prime importance, rather than those of their employers; that the controversy is one which has been carefully considered by the Chief General Officers of the Four Brotherhoods, who, as heretofore stated, have reached a decision to the effect that under the rules, regulations, constitutions and by-laws of said organizations, the trains should be manned by Illinois Central men; that continued operation of defendant's railroad can only be assured by acceding to the demands of the men and complying with the decision of their general officers."

It appears from the answer that the four railroad labor organizations have withdrawn from arbitration of the question involved before the National Mediation Board and "are unwilling to submit the matter in controversy to any governmental organization having jurisdiction of disputes of this character, though defendant is so willing."

The answer of defendant further states that:

"The granting of specific performance, injunction or other extraordinary process is not a matter of right but is a matter of discretion and that such process will not be granted where the granting of same would seriously affect the public interest, and defendant further avers that the public interest can be entirely preserved and plaintiff in no way injured by plaintiff permitting defendant's employees to man the said trains of plaintiff.

"And defendant now states that in the event there should be any added expense to plaintiff by placing defendant's employees on said trains, this defendant is ready and willing that said additional expense may be deducted from the compensation due by plaintiff to defendant for the use of defendant's line of railroad between Bemis, Tennessee, and Paducah, Kentucky.

"This defendant stands ready and willing to submit to any reasonable conditions which this Honorable Court may impose and insists that the plaintiff should be required also to submit to like conditions and thereby prevent irreparable damage to the public interest."

The plaintiff is unwilling to accept any modification or amendment of the contract of June 7, 1933; for in its original bill, it asserts: "The defendant cannot, alone, make a new contract nor amend the existing contract; that it cannot require or compel plaintiff to accept defendant's proposed amendment or subject itself to the result of defendant's repudiation of the entire contract. Plaintiff is not willing to waive its rights under the said contract to operate its trains with its own crews or employees; it has the right to operate its trains over the said line of defendant with plaintiff's own employees selected by it and a refusal by defendant to permit the operation of plaintiff's trains under the terms of the said contract would obstruct and prevent the said operation and the defendant would thus require and cause the abandonment of the said operation in violation of paragraphs. (18) to (21) of section 1 of the Interstate Commerce Act [49 U.S. C.A. § 1, pars. 18–21]."

The prayer of the bill invokes relief by injunction, and decree for specific performance of the contract of June 7, 1933, between the parties so as to assure the continued operation by plaintiff, over the lines of defendant between Bemis, Tenn., and Paducah, Ky., of plaintiff's through freight trains, drawn by its own locomotives and in charge of crews selected by plaintiff from its own employees.

On the day following the filing of the original bill in this cause, attorneys for both plaintiff and defendant appeared in open court and presented an order for entry to preserve the status quo of operation under the contract of June 7, 1933, until an application for temporary injunction could be seasonably presented and argued, after careful preparation on both sides of the controversy; it being stated then and repeated later by counsel that this course was satisfactory to the Big Four Railroad Brotherhoods, who wanted ample opportunity afforded the court for correct decision upon an important matter vitally affecting their interest. Following the argument on motion for temporary injunction, further time was requested and allowed for preparation of elaborate printed briefs.

(1) The plaintiff insists that the order of the Interstate Commerce Commission of May 20, 1933, directing a certificate of public convenience and necessity to be issued, effective June 7, 1933, with respect to the trackage rights here involved, is conclusive against all the defenses raised by the defendant, and entitles the plaintiff to an injunction restraining the defendant from interference with the operation, pursuant to the terms of the contract of June 7, 1933, of the plaintiff's through freight trains drawn by plaintiff's own engines and in charge of its own crews over the tracks of the defendant between Bemis and Paducah; and that the order entitles the plaintiff to a decree for specific performance by the defendant of the contract of June 7, 1933.

It is conceded that paragraphs 18, 19, and 20, U.S.C.A. title 49, added to the Interstate Commerce Act (section 1) by the Transportation Act of 1920, 41 Stat. 477, apply to operation of trackage agreements between railroads of the character of the contract of June 7, 1933, between the plaintiff and the defendant. See Transit Commission v. United States, 289 U.S. 121, 53 S.Ct. 536, 77 L.Ed. 1075. The Interstate Commerce Commission, therefore, had jurisdiction to issue a certificate of public convenience and necessity, permitting the operation by the Gulf, Mobile & Northern Railroad Company of its through freight trains over the lines of the Illinois Central Railroad Company between Bemis, Tenn., and Paducah, Ky. But from this it does not follow, in the absence of any express provision in the order of the Commission, that this governmental administrative agency intended to direct that plaintiff's freight trains, when run over defendant's tracks, should be manned by Gulf, Mobile & Northern employees.

The pertinent portion of the certificate of public convenience and necessity issued by the Commission reads as follows:

"Investigation of the matters and things involved in these proceedings having been had, and said division (Division 4, of I. C.C.) having, on the date hereof, made and filed a report containing the findings of fact and conclusions thereon, which said report is hereby referred to and made a part hereof;

"It is hereby certified, That the present and future public convenience and necessity (a) require the operation by the Gulf, Mobile and Northern Railroad Company, under trackage rights, over the railroad of the Illinois Central Railroad Company in Madison, Gibson, Weakley and Obion Counties, Tenn., and Hickman, Graves, and McCracken Counties, Ky., and over certain terminal facilities of the Nashville, Chattanooga & St. Louis Railway at Paducah, McCracken County, Ky., described in the application in Finance Docket No. 9916, and in the report aforesaid; and (b) permit the abandonment by the Gulf, Mobile & Northern Railroad Company of operation under trackage rights over the railroad of the Nashville, Chattanooga & St. Louis Railway, in Madison, Henderson, Carroll and Henry Counties, Tenn., and Calloway, Marshall, Graves and McCracken Counties, Ky., described in the application in Finance Docket No. 9921 and in the report aforesaid.

"It is ordered, That this Certificate shall become effective on June 7, 1933."

It will be observed that this order, approving the trackage rights, contains no language directing the plaintiff to operate trains drawn by its own engines and manned by its own employees.

■ The order of the Commission, however, expressly refers to and makes the report of the Commission, containing its findings of fact and conclusions thereon, a part of the order. Both the report and the order were filed on May 22, 1933. The order must be read in connection with the report. Georgia Public Service Commission v. United States, 283 U.S. 765, 51 S.Ct. 619, 75 L.Ed. 1397; Illinois Commerce Commission v. United States, 292 U.S. 474, 54 S.Ct. 783, 78 L.Ed. 1371; Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221.

The report recites: "Under a proposed agreement between the Illinois Central Railroad Company and the applicant (the plaintiff), a copy of which is filed with the application in Finance Docket No. 9916, the Illinois Central grants to the applicant, subject to our approval, the right to operate for bridge traffic only, its through freight trains over the Illinois Central tracks between Bemis and Paducah, such trains to be drawn by the applicant's own engines, and in charge of its own employees."

■ Nowhere in the report, however, is found any discussion implying the materiality or importance of the plaintiff's trains being operated over defendant's tracks by plaintiff's own train crews. Nor does the finding of the Commission in the concluding paragraph of the report specify any present or future public convenience and necessity of the use by the plaintiff of its own employees in operating its trains over the Illinois Central tracks. It is apparent that no such issue was presented by the evidence or considered by the Commission.

Nor does the report reveal any intimation of the possibility of a labor controversy arising out of the contract between the railroads, the objective of which was the use of tracks, or that any representative of the railroad employees was notified of the proceeding before the Commission, or was given a hearing by the Commission.

It is, therefore, necessary to consider and weigh the authorities to determine whether under all circumstances it must be implied that, because the Interstate Commerce Commission issued a certificate of public convenience and necessity to one railroad to operate its trains over the tracks of another, pursuant to a contract which provided that it would use its own train crews, the licensee railroad received, without express mandate from the Commission, an order, enforceable in a United States court by the extraordinary processes of injunction and specific performance, to use its own employees regardless of intervening public interest in the avoidance of a strike.

(2) The Supreme Court has distinctly held that the lack of express finding by the Interstate Commerce Commission may not be supplied by implication. Atchison, Topeka & Santa Fe R. R. Co. v. United States, 295 U.S. 193, 55 S.Ct. 748, 79 L.Ed. 1382, decided April 29, 1935.

In Baltimore & O. R. R. Co. v. United States, 298 U.S. 349, 358, 359, 56 S.Ct. 797, 803, 80 L.Ed. 1209, decided May 18, 1936 the Supreme Court said, with respect

to the Interstate Commerce Commission: "While presumed valid, its order may be annulled if shown to rest on a misconstruction of the act or upon inadequate or unsupported findings of fact." Citing: Interstate Commerce Commission v. Louisville & N. R. R. Co., 227 U.S. 88, 92, 33 S.Ct. 185, 57 L.Ed. 431; Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 62 L.Ed. 831; Chicago Junction Case, 264 U.S. 258, 265, 44 S.Ct. 317, 319, 68 L.Ed. 667; United States v. Abilene & S. Ry. Co., 265 U.S. 274, 291, 44 S.Ct. 565, 570, 68 L.Ed. 1016; Brimstone R. & C. Co. v. United States, 276 U.S. 104, 116, 117, 48 S.Ct. 282, 285, 72 L.Ed. 487; St. Louis & O'Fallon Ry. Co. v. United States, 279 U.S. 461, 487, 49 S.Ct. 384, 388, 73 L.Ed. 798; Florida v. United States, 282 U.S. 194, 214, 215, 51 S.Ct. 119, 124, 125, 75 L.Ed. 291; United States v. Baltimore & O. R. R. Co., 293 U.S. 454, 462, et seq., 55 S.Ct. 268, 271, 79 L.Ed. 587; Atchison, T. & S. F. Ry. Co. v. United States, 295 U.S. 193, 206, 55 S.Ct. 748, 754, 79 L.Ed. 1382.

Counsel for plaintiff cite: Virginian Ry. Co. v. United States, 272 U.S. 658, 47 S.Ct. 222, 71 L.Ed. 463; Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 51 S.Ct. 1, 75 L.Ed. 221; Georgia Public Service Commission v. United States, 283 U.S. 765, 51 S.Ct. 619, 75 L.Ed. 1397; Illinois Commerce Commission v. United States, 292 U.S. 474, 54 S.Ct. 783, 786, 78 L.Ed. 1371; Ohio v. United States, 292 U.S. 498, 54 S.Ct. 792, 794, 78 L.Ed. 1388.

All of these were cases brought before three-judge courts to enjoin or set aside orders of the Interstate Commerce Commission. All involved the question of rates; and, in each, the controversy respecting the rates was fully considered by the Commission upon substantial evidence produced. In each, the evidence before the Commission was held sufficient to justify the order. All, obviously, are distinguishable from the case at bar.

In the Beaumont Case, supra, the court said (282 U.S. 74, 86, 51 S.Ct. 1, 6, 75 L.Ed. 221): "Complete statements by the Commission showing the grounds upon which its determinations rest are quite as necessary as are opinions of lower courts setting forth the reasons on which they base their decisions in cases analogous to this."

In the Illinois Commerce Commission Case, supra, Mr. Justice Stone said: "The Commission reached its conclusion after full hearing and thorough consideration of all questions presented. As the record affords a sufficient basis for the Commission's determination, it is not subject to review in the courts. See Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 481, 38 S.Ct. 383, 62 L.Ed. 831; Assigned Car Cases, 274 U.S. 564, 580, 47 S.Ct. 727, 71 L.Ed. 1204."

In the Ohio Case, supra, Mr. Justice Roberts said that "There was evidence in substantial volume bearing upon the issue of the reasonableness of the existing interstate rates," and that "the commission in its report discusses this evidence in detail, and, based upon it, makes findings to the effect that the interstate rates * * * are reasonable."

Another case cited by counsel for plaintiff, New York Central Securities Corporation v. United States, 287 U.S. 12, 29, 53 S.Ct. 45, 50, 77 L.Ed. 138, involved rentals instead of rates and the same principles were applied. In upholding the order of the Interstate Commerce Commission, the Chief Justice said: "The remaining questions with respect to the adequacy of the rentals fixed, the other terms of the proposed leases, and the public interests involved, relate to the propriety of the action of the Commission in the exercise of its authority under the statute as construed. As to these matters the parties were fully heard, pertinent evidence was received and considered, and we find no basis for a contention that the order of the Commission was not adequately supported or had any confiscatory effect."

It is believed, from study of the cases, that unwarranted implication would be required to find that the order of the Interstate Commerce Commission here involved embraced an unchallengeable conclusion that the public convenience and necessity demanded the operation of plaintiff's trains over defendant's tracks by the former's employees.

■ (3) Even if the Interstate Commerce Commission intended by its order to determine finally the right of the plaintiff to use its own employees in operating trains over defendant's tracks, would the Commission have jurisdiction and power to do so? The conclusion has been reached that it would not.

Nowhere in the statutes of the United States is the Interstate Commerce Commission given jurisdiction over labor

controversies. The Railway Labor Act provides the means for governmental mediation of disputes growing out of the working conditions of railroad employees, but the statute does not compel arbitrament. Act May 20, 1926, c. 347, § 2, 44 Stat. 577, as amended by Act June 21, 1934, c. 691, § 2, 48 Stat. 1186 (45 U.S.C.A. § 151a). How, then, can any implication be drawn from the provisions of the Interstate Commerce Act that the issuance of an order beyond the jurisdiction of the Commission can attain such sanctity as to become enforceable by mandatory processes of United States courts, with the resultant effect that vital interests of organized labor become foreclosed thereby unless redeemed by the successful outcome of unwilling arbitration or by the economic force of a strike?

In Virginian Ry. Co. v. System Federation No. 40, 300 U.S. 515, 554, 57 S.Ct. 592, 602, 81 L.Ed. 789, the Supreme Court held that the activities of "back shop" employees engaged on heavy repairs on locomotives and cars withdrawn from service for long periods, bear such relation to the interstate activities of the carrier as to be regarded as part of them.

The Los Angeles Switching Case (Interstate Commerce Commission v. Atchison, T. & S. F. R. Co.), 234 U.S. 294, 34 S.Ct. 814, 58 L.Ed. 1319, is no more than a holding that the court cannot substitute its judgment for that of the Interstate Commerce Commission upon matters of fact within the province of the Commission.

Atchison, Topeka & Santa Fe R. R. Co. v. United States, supra, is cited by the Circuit Court of Appeals for the Second Circuit, in Aron v. Pennsylvania R. R. Co., 80 F.(2d) 100, 102, 103 A.L.R. 1367, in holding that the courts are not concluded from examining anew a question involving the jurisdiction of the Interstate Commerce Commission.

Likewise, the Supreme Court has recognized the right of the courts to question the jurisdiction of the Interstate Commerce Commission.

In Skinner & Eddy Corporation v. United States, 249 U.S. 557, 562, 39 S.Ct. 375, 377, 63 L.Ed. 772, Mr. Justice Brandeis said: "The defendants contend that the District Court did not have jurisdiction of the subject-matter of this suit; because orders entered in a fourth section proceeding cannot be assailed in the courts;

at least not until after a remedy has been sought under sections 13 and 15 of the Act to Regulate Commerce. * * * This contention proceeds apparently upon a misapprehension of plaintiff's position. If plaintiff had sought relief against a rate or practice alleged to be unjust because unreasonably high or discriminatory, the remedy must have been sought primarily by proceedings before the commission [citing Loomis v. LeHigh Valley R. R. Co., 240 U.S. 43, 50, 36 S.Ct. 228, 60 L.Ed. 517, and other cases]; and the finding thereon would have been conclusive, unless there was lack of substantial evidence, some irregularity in the proceedings, or some error in the application of rules of law [citing Manufacturers' Ry. Co. v. United States, 246 U.S. 457, 482, 38 S.Ct. 383, 62 L.Ed. 831; and other cases]. But plaintiff does not contend that 75 cents is an unreasonably high rate, or that it is discriminatory, or that there was mere error in the action of the commission. The contention is that the commission has exceeded its statutory powers; and that, hence, the order is void. In such a case the courts have jurisdiction of suits to enjoin the enforcement of an order, even if the plaintiff has not attempted to secure redress in a proceeding before the commission [citing Interstate Commerce Commission v. Diffenbaugh, 222 U.S. 42, 49, 32 S.Ct. 22, 56 L.Ed. 83, and other cases]. The District Court properly assumed jurisdiction of this suit."

In an earlier case, Southern Pacific Co. v. Interstate Commerce Commission, 219 U.S. 433, 31 S.Ct. 288, 291, 55 L.Ed. 283, Chief Justice White said: "We are of opinion that the court below erred in not restraining the enforcement of the order complained of, because we see no escape from the conclusion that the order was void because it was made in consequence of the assumption by the Commission that it possessed the extreme powers which the railroad companies insist the order plainly manifests."

(4) From insistence that the Interstate Commerce Act places a mandatory duty upon the courts to enforce obedience to the orders of the Commission, counsel for plaintiff deduce that this court is compelled to grant the mandatory injunction prayed and to decree specific performance of the contract in all of its terms.

Central New England Ry. Co. v. Boston & Albany R. R. Co., 279 U.S. 415, 49

S.Ct. 358, 73 L.Ed. 770, answers the argument of the plaintiff. The case involved the effect of an order of the Interstate Commerce Commission which it was contended relieved a carrier of its obligation to make further payment under a trackage agreement. In holding to the contrary, the Supreme Court pointed out that the certificate of the Commission certified only that public convenience and necessity permitted the abandonment of the trackage and that the petitioner was authorized to abandon it; and that the respondent "whose rights were vitally affected by the order" was not notified of the proceeding before the Commission, nor a party to it. The court said (279 U.S. 415, 419, 421, 49 S.Ct. 358, 359, 73 L.Ed. 770): "Even if the broad purposes ascribed to the Act be assumed, it is not to be supposed that the Commission intended to do more than was stated in its order. * * * Respondent does not ask that the order be set aside or that it be regarded as illegal and void; it insists only that the order did not purport to deal with the contract between the carriers, and so cannot have the effect, attributed to it by petitioner, of annulling the contract. The question is merely one of the legal effect of the order."

In United States v. Chicago, Milwaukee, St. Paul & Pacific R. R. Co., 294 U.S. 499, 55 S.Ct. 462, 79 L.Ed. 1023, it was held that an order of the Interstate Commerce Commission disapproving reduced rates proposed by a carrier is void, unless supported by findings of the basis or quasi jurisdictional facts conditioning the power of the Commission. With reference to the report of the Commission, Mr. Justice Cardozo said (294 U.S. 499, 510, 511, 55 S.Ct. 462, 467, 79 L.Ed. 1023): "The difficulty is that it [the Commission] has not said so with the simplicity and clearness through which a halting impression ripens into reasonable certitude. In the end we are left to spell out, to argue, to choose between conflicting inferences. Something more precise is requisite in the quasi jurisdictional findings of an administrative agency. Beaumont, S. L. & W. Ry. Co. v. United States, 282 U.S. 74, 86, 51 S.Ct. 1, 75 L.Ed. 221; Florida v. United States, 282 U.S. 194, 215, 51 S.Ct. 119, 75 L.Ed. 291. We must know what a decision means before the duty becomes ours to say whether it is right or wrong."

See, also, Interstate Commerce Commission v. Illinois Cent. R. R. Co., 215 U.S. 452, 30 S.Ct. 155, 54 L.Ed. 280.

Upon the principles of the three last-cited cases and of other authorities discussed earlier in this opinion, it is manifest that no duty has been imposed upon this court to adjudge contrary to its own interpretation of the scope, meaning, and effect of an order of the Interstate Commerce Commission. If this were a proceeding instituted to suspend or restrain the enforcement, operation, or execution of an order entered by the Interstate Commerce Commission, or to set aside in whole or in part any such order, it would be necessary that the case be heard and determined by a three-judge court, as provided by statute, 28 U.S.C.A. § 47.

But it is clear that this case is no such proceeding.

In Central New England Ry. Co. v. Boston & Albany R. R. Co., 279 U.S. 415, 420, 49 S.Ct. 358, 360, 73 L.Ed. 770, Mr. Justice Stone said: "As the suit is upon contract and does not assail the order of the Commission, it is not one to 'enjoin, set aside, annul or suspend' an order of the Commission."

This case is at bar by bill in equity to enforce by extraordinary remedies the interpretation placed by the plaintiff on an order of the Commission. A justiciable controversy, fully determinable by the single United States District Judge within whose district the suit is filed, is therefore plainly presented.

(5) But a paramount consideration repels the extraordinary relief sought by the plaintiff. No court should compel the specific performance of a contract, if such action would be contrary to the public interest. This is settled doctrine. Virginian Ry. Co. v. System Federation, 300 U.S. 515, 57 S.Ct. 592, 81 L.Ed. 789, decided March 29, 1937; Pennsylvania v. Williams, 294 U.S. 176, 185, 55 S.Ct. 380, 385, 79 L.Ed. 841, 96 A.L.R. 1166; Central Kentucky Gas Co. v. Railroad Commission, 290 U.S. 264, 270–273, 54 S.Ct. 154, 156, 157, 78 L.Ed. 307; Harrisonville v. W. S. Dickey Clay Co., 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208; Beasley v. Texas & Pacific Ry. Co., 191 U.S. 492, 497, 24 S.Ct. 164, 48 L.Ed. 274; Joy v. St. Louis, 138 U.S. 1, 47, 11 S.Ct. 243, 34 L.Ed. 843; Texas & Pacific Ry. Co. v. Marshall, 136 U.S. 393, 405, 406, 10 S.Ct. 846, 34 L.Ed. 385; Seaboard Air Line Ry. Co. v. Atlanta, etc., R. R. Co., 35 F.(2d) 609 (C.C.A.5); Conger v. New York,

etc., R. R. Co., 120 N.Y. 29, 32, 33, 23 N.E. 983.

■■■■ The first cited and most recently decided case on the foregoing list of authorities is especially pertinent here; for the language of Mr. Justice Stone applied directly to labor controversies. He said (300 U.S. 515, 552, 57 S.Ct. 592, 601, 81 L.Ed. 789): "The peaceable settlement of labor controversies, especially where they may seriously impair the ability of an interstate rail carrier to perform its service to the public, is a matter of public concern. That is testified to by the history of the legislation now before us, the reports of committees of Congress having the proposed legislation in charge, and by our common knowledge. Courts of equity may, and frequently do, go much farther both to give and withhold relief in furtherance of the public interest than they are accustomed to go when only private interests are involved."

In speaking for an unanimous court, he said further (300 U.S. 515, 551, 57 S.Ct. 592, 601, 81 L.Ed. 789): "The extent to which equity will go to give relief where there is no adequate remedy at law is not a matter of fixed rule. It rests rather in the sound discretion of the court." Virginian Ry. Co. v. System Federation No. 40, supra.

In Seaboard Air Line Ry. Co. v. Atlanta, etc., R. R. Co., 35 F.(2d) 609, 610 (C.C.A.5), it was said: "In the exercise of its discretion, a court of equity may refuse specific enforcement of a valid contract where, by granting that relief, a paramount public interest will or may be interfered with."

It was stated in Beasley v. Texas & Pacific Ry. Co., supra, 191 U.S. 492, 497, 24 S.Ct. 164, 166, 48 L.Ed. 274: "To compel the specific performance of contracts still is the exception, not the rule, and courts would be slow to compel it in cases where it appears that paramount interests will or even may be interfered with by their action."

In United States ex rel. Greathouse v. Dern, Sec. of War, 289 U.S. 352, 359, 53 S.Ct. 614, 617, 77 L.Ed. 1250, it was held that remedy by mandamus may be refused for reasons comparable to those which would lead a court of equity, in the exercise of a sound discretion, to withhold its protection of an undoubted legal right. The court said (289 U.S. 352, 360, 53 S.Ct. 614, 617, 77 L.Ed. 1250): "In its sound discretion, a court of equity may refuse to enforce or protect legal rights, the exercise of which may be prejudicial to the public interest."

The state courts, likewise, have recognized and applied this principle. Conger v. New York, etc., R. R. Co., supra; Whalen v. Baltimore & O. R. R. Co., 108 Md. 11, 69 A. 390, 17 L.R.A.(N.S.) 130, 129 Am. St.Rep. 423; Curran v. Holyoke Water Power Co., 116 Mass. 90; Southern Ry. Co. v. Franklin, etc., R. R. Co., 96 Va. 693, 32 S.E. 485, 44 L.R.A. 297.

It seems unnecessary to refer to numerous other authorities which could be cited in support of this established doctrine.

Joy v. St. Louis, 138 U.S. 1, 11 S.Ct. 243, 34 L.Ed. 843, heavily leaned upon by counsel for plaintiff does not sustain their argument; because, in ordering specific performance of a contract for the joint use of a railroad bridge and terminal, the Supreme Court recognized the principle that the rights of the public in respect to railroads should be fostered by the court. It was said (138 U.S. 1, 47, 11 S.Ct. 243, 257, 34 L.Ed. 843): "Considerations of the interests of the public are held to be controlling upon a court of equity, when a public means of transportation, such as a railroad, comes into the possession and under the dominion of the court. These considerations have been recognized and applied by this court in several cases. Barton v. Barbour, 104 U.S. 126, [26 L.Ed. 672]; Miltenberger v. Logansport Ry. Co., 106 U.S. 286, 311, 312, 1 S.Ct. 140 [27 L.Ed. 117]; Union Trust Co. v. Illinois Midland Ry. Co., 117 U.S. 434, 458, 6 S.Ct. 809 [29 L.Ed. 963]."

That the public interest was the paramount consideration in the mind of the court in granting specific performance is manifest from this language in the opinion, 138 U.S. 1, at page 50, 11 S.Ct. 243, 258, 34 L.Ed. 843: "Here is a great public park, one of the lungs of an important city, which, in order to maintain its usefulness as a park, must be as free as possible from being serrated by railroads; and yet the interests of the public demand that it shall be crossed by a railroad. But the evil consequences of such crossing are to be reduced to a minimum by having a single right of way, and a single set of tracks to be used by all the railroads which desire to cross the park. These two antagonisms must be reconciled, and that can be done only by the interposition of a

294

court of equity, which thus will be exercising one of its most beneficent functions."

In Harrisonville v. Dickey Clay Co., 289 U.S. 334, 338, 53 S.Ct. 602, 603, 77 L.Ed. 1208, the observation is made by Mr. Justice Brandeis that, "Where an important public interest would be prejudiced, the reasons for denying the injunction may be compelling. * * * Where substantial redress can be afforded by the payment of money and issuance of an injunction would subject the defendant to grossly disproportionate hardship, equitable relief may be denied although the nuisance is indisputable. This is true even if the conflict is between interests which are primarily private."

(6) The Virginian Railway Case, supra, unequivocally recognizes the public interest and concern in the peaceable settlement of labor controversies which may seriously interfere with the public service of a carrier engaged in interstate commerce.

 Is the public interest concerned in the instant litigation? Unquestionably, it is. If the full relief prayed by the plaintiff be granted, and the defendant company is required to permit the operation of the plaintiff's trains over the former's tracks, manned by the latter's employees, it is evident from the affidavits in the record that a strike vote will be taken by the employees of the Illinois Central Railroad, with the belief expressed under oath by the railroad brotherhood chiefs that a strike will be decreed by the membership of these unions, in which the majority of the employees of both the plaintiff and the defendant hold membership.

The 6,477 men employed by the defendant railroad have the unquestioned lawful right to strike. This right is guaranteed in express terms in section 2, par. 10, of the Railway Labor Act, as amended (45 U.S.C.A. § 152(10): "Nothing in this chapter shall be construed to require an individual employee to render labor or service without his consent, nor shall anything in this chapter be construed to make the quitting of his labor by an individual employee an illegal act; nor shall any court issue any process to compel the performance by an individual employee of such labor or service, without his consent."

The lines of the Illinois Central Railroad approximate 7,000 miles of trackage,

and extend through 14 states of the Union. A large volume of interstate traffic is, of course, affected by this extensive operation; and many cities, towns, hamlets, and communities depend exclusively on this particular railroad for freight and passenger transportation. The moving of the products of farm and factory, and the interchange of commodities, is directly involved.

It requires no elaboration of detail to conclude that the public interest and the general welfare is involved in the avoidance of the paralyzing effect of a lawful strike by the employees of a great railroad system, upon agriculture, industry, and commerce, with consequential damage to myriads of human beings. Against this public interest, the plaintiff urges its right to designate 12 of the 316 men now in its employ to continue in jobs which could be competently filled by 12 persons selected by the plaintiff from the list of Illinois Central employees. The 12 men whose interests are involved in the retention of their jobs have been overruled in their claims by the constituted representatives selected, as such, by the majority of the membership of the four railroad brotherhoods, recognized as the established collective bargaining agency.

Upon all considerations of substantial justice, as well as upon principles of settled law heretofore discussed, a decree for specific performance of the letter of the contract between the two litigating railroads should not be entered in this cause.

If it appears that an injunction would be against public policy, a court of equity may properly refuse to be made an instrument for such a result, whatever the pleadings. Beasley v. Texas & Pacific R. R. Co., 191 U.S. 492, 498, 24 S.Ct. 164, 48 L.Ed. 274.

A court of equity "may withhold from a plaintiff the complete relief to which he would otherwise be entitled if the defendant is willing to give in its stead such substituted relief as, under the special circumstances of the case, satisfies the requirements of equity and good conscience." Central Kentucky Natural Gas Co. v. Railroad Comm. of Kentucky, 290 U.S. 264, 271, 54 S.Ct. 154, 157, 78 L.Ed. 307.

The defendant in this case has met the standard of this requirement, in offering to bear any added expense to the plaintiff resultant from the placing of de-

fendant's employees on plaintiff's trains run over defendant's tracks.

Accordingly, a mandatory injunction, directing specific performance of the order of the Interstate Commerce Commission, as herein construed by this court, will be entered; but the decree will be limited to the requirement that the Illinois Central Railroad Company permit the Gulf, Mobile & Northern Railroad Company to continue to operate its trains over the tracks of the former, within the designated territory, and will negative the right of the plaintiff to insist that such trains be in charge of the employees of the plaintiff.